PODOLIN et al. v. LESHER WARNER DRY GOODS CO.

(Circuit Court of Appeals, Third Circuit. January 26, 1914.)

No. 1752.

1. BANKRUPTCY (§ 28*)—SCHEDULES—DUTY TO FILE—INFORMATION—CRIMINAL PROSECUTION.

Bankrupts made a financial statement to creditors June 10, 1911, and on October 17th following a petition in bankruptcy was. filed against them. Thereafter criminal proceedings were instituted against them for conspiracy to defraud creditors by the fraudulent use of the mails, consisting of the sending through the mail 'of such prior financial statement, which was claimed to be false and fraudulent. *Held*, that there was no such connection between the bankrupts' condition in June and at the time it became their duty to file their schedules as would entitle them to refuse to give a list of creditors holding securities, a list of those whose claims were unsecured, a list of liabilities in bills or notes discounted, which ought to be paid by drawers, etc., a list of stock in business and the value thereof, and a list of personal property and debts due them on open accounts, on the theory that to do so would tend to incriminate them, in that the government, from such schedules when filed, might be able to obtain evidence to show that the financial statement was false.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 27; Dec. Dig. § 28.*]

2. BANKRUPTCY (§ 28*)—WITNESSES—CONSTITUTIONAL PRIVILEGE.

Where a bankrupt claims his constitutional privilege to refuse to testify or furnish information, on the ground that it will tend to incriminate him, it must at least appear to the court, from the character of the information sought or the question propounded, that his claim is justified, or he must produce facts on which he bases such claim, in order that the court may judge of their sufficiency to support it.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 27; Dec. Dig. § 28.*]

Petition for Review from the District Court of the United States for the Eastern District of Pennsylvania; John B. McPherson, Judge.

In the matter of bankruptcy proceedings of Israel Podolin and others, trading as the Franklin Suit & Skirt Company. On application of the Lesher Warner Dry Goods Company, an order was entered requiring the bankrupts to complete their schedules, and, this order having been affirmed (205 Fed. 563), the bankrupts petition for review. Affirmed.

Clinton O. Mayer, of Philadelphia, Pa., for petitioners.

J. Howard Reber, of Philadelphia, Pa., for respondent.

Before GRAY and BUFFINGTON, Circuit Judges, and YOUNG, District Judge.

GRAY, Circuit Judge. This is an appeal from the decree of the court below affirming, with a modification, the order of the referee in bankruptcy, that the bankrupts above named should, within 30 days, complete their schedules in bankruptcy by the addition of a list of creditors holding securities; a list of creditors whose claims are unsecured; a list of liabilities in notes or bills discounted which ought to be paid

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

210 F.—7

by makers, drawers and acceptors; a list of stock in business and the valuation thereof; a list of personal property of whatever description and the place where situate, and a list of debts due bankrupts on open accounts; as required by the bankrupt law and the orders in bankruptcy.

On the 17th day of October, 1911, a petition in involuntary bankruptcy was filed against Israel Podolin, Louis Brod, and Benjamin Dein, individually and trading as the Franklin Suit & Skirt Company.

On the 3d day of November, 1911, a receiver having been appointed, he filed a petition for an order on one Samuel Rudsky, to deliver over unto him certain merchandise claimed to be the property of the alleged bankrupts. An issue was made, the case proceeded with before a special referee, the bankrupts called for examination therein, and a report made. It was therein found that the bankrupts, in conjunction with Rudsky and others, had fraudulently removed these goods from their place of business under an alleged delivery of the same as collateral security for a loan, and that the property was the property of the receiver, and not of Rudsky. This finding was affirmed by the court below, and there has been no appeal therefrom.

On December 19, 1911, a warrant was issued in the District Court, on information filed by the Postal Department against the bankrupts, alleging a conspiracy to defraud creditors by fraudulent use of the mails. An indictment was found against the three bankrupts at the March sessions, 1912, of that court, charging them with having sent through the mails a statement of their financial worth which was false and fraudulent and gotten up for the purpose of cheating and defrauding creditors. This indictment is pending and undisposed of.

An adjudication in bankruptcy was made on the 28th day of June, 1912, and the bankrupts declined to file schedules in the case, as required by the bankrupt act and the orders in bankruptcy made thereunder, on the ground that they would tend to incriminate them. The referee, upon argument, decided that the bankrupts should file their schedules in bankruptcy, and that whenever particular information required under those schedules was such as might incriminate them, they should refuse to furnish it, upon the specific ground that in doing so it might incriminate them. The referee's decision was sustained by the District Court.

The bankrupts then filed schedules, which answered certain of the questions which they were required to answer, but declined to answer questions or give lists under the following heads:

List of creditors holding securities;

List of creditors whose claims are unsecured;

List of liabilities in notes or bills discounted which ought to be paid by drawers, makers, acceptors, or indorsers;

List of stock in trade in business and the value thereof;

List of goods or personal property of any other description, with the place where it is situated;

List of debts due bankrupts on open accounts.

A petition was then filed by a creditor of the bankrupt, asking for an order that the bankrupts should complete their schedules in bankruptcy

so as to contain the matter omitted. The bankrupts filed an answer, averring that they had replied to all the questions except such as should tend to incriminate them.

The learned referee, whose statement of the case we have so far followed, in the course of his clear and well reasoned report, says:

"The indictment found against the bankrupts is based upon an alleged statement of theirs, dated September 6, 1911, containing a statement of their accounts as of June 10th of the same year. It embraces a list of book accounts and merchandise on hand on the asset side, and open accounts and loans on the liability side, and they allege that if they are compelled to set forth a list of their creditors as of the date of the filing of the petition in bankruptcy, even though it were several months after the date of the statement, it would furnish the names of the parties with whom they dealt and from it could be obtained a statement of the accounts of the bankrupts with them as of June 10, 1911, the sum total of which might differ entirely from the statement of liabilities as set forth in the bankrupts' statement upon which they were indicted.

"It has been repeatedly held that a bankrupt pleading his constitutional privileges must give such information to the court as will enable it to judge whether he is within such privilege, and the question before the referee is therefore, whether under the circumstances of this case, the filing of the omitted lists would furnish information to sustain the criminal charge. It is not, in the referee's opinion, material that these lists might in some unlikely contingency, give such information. They must be such as would evidently do so."

The referee concludes with an order that the bankrupts should, within 30 days, complete their schedules in bankruptcy, above referred to, as required by law.

On the petition of the bankrupts, the referee certified to the District Court, under General Order No. 27 (89 Fed. xi, 32 C. C. A. xxvii) the facts in the case touching the refusal by the bankrupts to give complete lists in the schedules required by law to be filed by them; on the ground that to do so would incriminate them, and the order and action of the referee in regard thereto, as above stated.

The matter having been heard before the District Court on this certificate, the learned judge thereof filed a memorandum, as follows:

"The referee's order of May 12, 1913, will be so modified, ex majori cautela, as to provide expressly that the bankrupts may omit from their schedules any reference to the transaction with Rudsky. They are still exposed to the danger of prosecution in connection with that transaction, and they should not be compelled to run the not remote risk of having their statements used against them in such a prosecution. The connection between such statements and the evidence required to sustain the prosecution is direct and immediate.

"But their objection to filling out the other schedules cannot be sustained. These (A3, A4, B2c and B3a) require them to set forth certain facts about their financial condition in October, and I have not been convinced that these facts have so close a connection with the written representations about their condition that were mailed in the preceding June as would tend to convict them of a postal crime in making such representations. In my opinion the connection, if it exists at all, is remote and contingent, and need not be taken into account.

"With the foregoing modification, and with a slight change in date, so that the bankrupts are now directed to file their schedules on or before June 16th, instead of the date fixed by the referee—his order is affirmed."

Thereafter, a decree was entered, directing the bankrupts to file the schedules as required by the bankrupt law, and the general orders made thereunder, showing their financial condition in October, 1911, but

omitting any reference to their transaction with Rudsky. We recognize the importance of the question involved in this case, and have given it due consideration. No decision of the supreme court, or of any federal court, has been cited exactly in point and covering the precise question here involved. That question is, whether the bankrupts are justified, under the fifth amendment of the Constitution of the United States, which declares that "no person * * * shall be compelled in any criminal case to be a witness against himself," in refusing to comply with the requirement of section 7 of the Bankrupt Act of 1898 (30 Stat. 548, c. 541 [U. S. Comp. St. July 1, 1901, p. 3424]), that they should, within 10 days after adjudication, make oath to and file a schedule of their property, showing the amount, kind, and location thereof, its money value in detail, and a list of their creditors, showing their residences, if known, the amounts due each of them, the consideration therefor, and the security held by them, if any, in the manner prescribed by the orders in bankruptcy.

Whatever may have been the opinion, therefore, as to the scope of the privilege conferred by this constitutional provision, it has been settled ever since the Counselman Case, 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110, that the privilege is not confined to a criminal case against the person himself who claims it.

Counselman had been subpœnaed before a grand jury in the Northern district of Illinois, to testify in an investigation requested by the Interstate Commerce Commission, and then being conducted by the district attorney for that district, as to whether certain railroads engaged in interstate commerce had violated the provisions of the act in that behalf, by charging to certain shippers less than their published tariff rates for the transportation of grain, and in this manner giving preference to such shippers. Counselman was a large shipper of grain, with offices in Chicago, and in his examination he declined to answer, on the ground that to answer might tend to incriminate him, such questions as the following:

"Have you during the past year, Mr. Counselman, obtained a rate for the transportation of your grain on any of the railroads coming to Chicago from points outside of this state, less than the tariff or open rate?"

Other and kindred questions to the same purport were submitted to him, all of which he declined to answer, upon the same ground. Having been committed for contempt by the District Court, for refusal to answer these questions, a writ of habeas corpus was sued out in his behalf, which finally reached the Supreme Court.

In discussing the scope of the constitutional provision invoked by Counselman, the Supreme Court says:

"It is broadly contended on the part of the appellee that a witness is not entitled to plead the privilege of silence, except in a criminal case against himself; but such is not the language of the Constitution. Its provision is 'that no person shall be compelled in *any* criminal case to be a witness against himself.' This provision must have a broad construction in favor of the right which it was intended to secure. The matter under investigation by the grand jury in this case was a criminal matter, to inquire whether there had been a criminal violation of the interstate commerce act. If Counselman had been guilty of the matters inquired of in the questions which he refused to answer, he himself was liable to criminal prosecution under the Act. The case before

the grand jury was therefore a criminal case. The reason given by Counsel-man for his refusal to answer * * * was that, if he answered the questions truly and fully (as he was bound to do if he should answer them at all), the answers might show that he had committed a crime against the Interstate Commerce Act, for which he might be prosecuted. His answers, therefore, would be testimony against himself, and he would be compelled to give them in a criminal case. * * * The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard.

"It is argued for the appellee that the investigation before the grand jury was not a criminal case, but was solely for the purpose of finding out whether a crime had been committed. * * * In support of this view reference is made to article 6 of the amendment to the Constitution of the United States, which provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury. * * *

"But this provision distinctly means a criminal prosecution against a person who is accused and who is to be tried by a petit jury. A criminal prosecution under article 6 of the amendments is much narrower than a 'criminal case,' under article 5 of the amendments. It is entirely consistent with the language of article 5, that the privilege of not being a witness against himself is to be exercised in a proceeding before a grand jury."

The court then commented upon section 860 of the Revised Statutes (U. S. Comp. St. 1901, p. 661) then in force, providing:

"That no answer or other pleading of any party and no discovery or evidence obtained by means of any judicial proceeding from any party or witness * * * shall be given in evidence or in any manner used against such party or witness * * * in any court of the United States or in any proceeding by or before any officers of the United States in respect to any crime."

It was held that this provision of the statute in no way superseded or interfered with the assertion of the privilege of exemption granted by the fifth amendment. It merely prevented such admissions of the accused from being proved against him, and did not cover a refusal to testify in some other proceeding, on the ground that the answer might tend to incriminate the one who was interrogated. In other words:

"The protection afforded of section 860 is not coextensive with the constitutional provision."

In the very recent case of Ensign v. Pennsylvania, 227 U. S. 592, 33 Sup. Ct. 321, 57 L. Ed. 658, the Supreme Court, in an opinion by Mr. Justice Pitney, was dealing with a case which arose in the state court of Pennsylvania, in which the question was, whether the schedules filed by a bankrupt and the books and papers which he turned over to the trustee under the peremptory requirement of the bankrupt law, could be used in a criminal trial of the bankrupt in a state court. It was decided that the fifth amendment to the Constitution of the United States is not obligatory upon the governments of the several states, or their judicial establishments, and regulates the procedure of the federal courts only. The question debated was, whether the bankrupt in a criminal trial could rely upon that part of clause 9 of section 7 of the bankrupt law, which declares:

"But no testimony given by him shall be offered in evidence against him in any criminal proceeding."

It was held that the word "testimony" more properly refers to oral evidence, and that it is only the testimony given upon the examination

of the bankrupt under clause 9, that is prohibited from being offered in evidence against him in a criminal proceeding. That the schedules, therefore, filed by a bankrupt were not within the prohibition of this clause.

Referring to section 860 of the Revised Statutes, it was said:

"This section (since repealed by Act of May 7, 1910, c. 216, 36 Stat. 352 [U. S. Comp. St. Supp. 1911, p. 272]) was in force at the time of the trial of plaintiffs in error, but by its own terms it is limited to criminal proceedings in 'any court of the United States,' and constitutes no limitation upon the procedure of the state courts."

It is plain that this decision does not touch upon the question with which we are here concerned, viz., the right of the bankrupt, under the fifth amendment to the Constitution, to decline to file the schedules which the seventh section of the bankrupt law makes it obligatory upon him to file.

Cases like that of Johnson v. United States (C. C. A. First Circuit) 163 Fed. 30, 89 C. C. A. 508, and Cohen v. United States (C. C. A. Fourth Circuit) 170 Fed. 715, 96 C. C. A. 35, based on the prohibition of section 860, do not help us in the determination of this question.

It is plain that what was really decided in the Counselman Case was, that a witness before a grand jury which was investigating the matter of an alleged violation of the provisions of the Interstate Commerce Act by certain railroads engaged in interstate commerce, could not be compelled, as a shipper on such roads, to answer the direct question, whether he had received in his shipments any rebate from said railroads. The court seemed to think it necessary to decide that the investigation in which the grand jury was engaged was a criminal case, within the meaning of those words as used in the fifth amendment, and that in such an investigation, therefore, the witness was not compelled to give testimony which in itself would show that he had committed a crime.

It is true that, in the extended discussion of the exemption declared by the fifth amendment, and of the decisions under the common law in England, and by state courts in regard to similar provisions in state constitutions, the learned justice who delivered the opinion of the court used language indicative of an opinion that the amendment should be so liberally construed as to insure that a person shall not be compelled, when acting as a witness in any investigation, to give testimony which may tend to show that he himself has committed a crime.

Assuming this to be so, it remains to consider whether a bankrupt may in every such case as this decide for himself whether the information that is required of him, by the mandatory provisions of the bankrupt law, is of such a character that permits him to invoke the protection of the fifth amendment, in refusing to comply with the law.

In such a case as that of Counselman, it is apparent that, if the witness answer the questions put to him in the affirmative, he directly incriminates himself, and his refusal to answer is of course an admission that his answer, if true, would have had to be an affirmative one.

[1] What was required of the bankrupts in the case before us was entirely independent of the charge in the indictment, then pending

against them, of having made a false statement of their assets and liabilities as of the date of June 10, 1911, for the sending of which they had used the United States mail.

The petition in bankruptcy was filed the following October 17th. The bankrupts claimed that as the statement of June 10th may be false, the furnishing of the data in these schedules, showing the assets, and liabilities as of October 17th, might incriminate them. The financial statement of June 10, 1911, was in the usual form of all financial statements, giving the lump amount of assets on hand as of that date, the total amount of the book accounts and the total amount of liabilities. Is it conceivable, as asked by counsel for the appellee, that a statement of June 10, 1911, giving the lump amount of merchandise at a certain figure, could possibly have any reasonable connection with the amount of merchandise in the bankrupt's possession on the following October 17th, especially when we have evidence of the exact amount of merchandise which came into the possession of the receiver. Or again, is it conceivable that the amount of outstanding accounts on October 17th can have any possible direct connection with the gross amount of outstanding accounts, as shown in the statement of June 10th, or that a list of creditors or the setting forth a list of liabilities or notes discounted, which ought to be paid by the makers as of October 17th, can have any directly incriminating relation to a statement of gross liabilities in a lump sum issued in the previous June. We think with the court below that the connection is too remote and contingent to furnish the basis for the assertion of the privilege conferred by the fifth amendment. The giving of such information certainly does not make the bankrupts witnesses against themselves, within the meaning of the fifth amendment. To hold otherwise, it seems to us, would in a large measure hinder the efficient administration of the bankrupt law, and would extend to confessedly dishonest persons a privilege never intended for their benefit.

[2] Where the bankrupt claims his constitutional privilege under the amendment, and refuses to give the information required by the Bankrupt Act, on the ground that it may incriminate him, it must at least appear to the court from the character of the information sought or the question propounded, that his claim is justified, or the bankrupt must produce facts on which he bases such claim, in order that the court may judge of their sufficiency to support it. Brown v. Walker, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. Ed. 819.

In the trial of Aaron Burr, 1 Burr's Trial, 190, 193, cited in both the majority and dissenting opinions in Brown v. Walker, supra, a witness called before the grand jury was asked whether he had, under instructions from Aaron Burr, kept a certain paper which was then exhibited to him. This question the witness refused to answer, lest he might thereby incriminate himself. The Chief Justice holding that the witness must be interrogated on oath, as to whether his answer to the question would incriminate himself, the witness replied that it might in a certain case. Thereupon, the Chief Justice, as cited in the dissenting opinion above referred to, expressed himself as follows:

"When a question is propounded, it belongs to the court to consider and to decide whether any *direct* answer to it can implicate the witness. If this

be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a *direct* answer to it *may* criminate himself, then he must be the sole judge what his answer would be."

Liberal as the scope given to the fifth amendment by the court is and ought to be, it was never intended that a bankrupt, dishonest or otherwise, should be clothed with the power to decide for himself when and under what circumstances he was authorized by the amendment to interrupt the bankruptcy procedure, by refusing to conform to the requirements of the law. In the present case, there is clearly no direct and apparent self-incrimination that necessarily attaches to the information that is required to be given in the schedule, and in the absence of the facts and details of what that information would be, there is no basis upon which the court could sustain the asserted right of the bankrupts to decline to comply with the requirements of the law. There is merely a suggestion that, though not directly incriminating, it might perhaps to their disadvantage give clues for investigation in the prosecution of the indictment against them. As said by the Supreme Court in the case of In re Harris, 221 U. S. 274, 31 Sup. Ct. 557, 55 L. Ed. 732, in deciding that the bankrupt's books belonged to the trustee in bankruptcy and cannot be withheld from him on the ground that they incriminate the bankrupt, "that is one of the misfortunes of bankruptcy if it follows crime."

We think the judgment of the court below should be affirmed, and it is so ordered.