UNITED STATES of America,
Plaintiff-Appellee,

v.

Walter Merlin CHASE, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Wilbur Floyd HILLIARD, Defendant-
Appellant.

Nos. 12837, 12838.

United States Court of Appeals
Seventh Circuit.

Aug. 10, 1960.

Jack A. Brunnenmeyer, Peoria, Ill., Harold L. Beamish, Aurora, Ill., for appellants.

Harlington Wood, Jr., U. S. Atty., Edward F. Casey and Marks Alexander, Asst. U. S. Attys., Springfield, Ill., for appellee.

Before DUFFY, KNOCH and MAJOR, Circuit Judges.

DUFFY, Circuit Judge.

Each of the appellants hereinafter referred to as defendants, entered pleas of guilty to five indictments charging them with violations of certain subsections of Title 18 U.S.C.A. § 2113, the Federal Bank Robbery Statute. Chase was sentenced to imprisonment for an aggregate of twenty years. Hilliard, who was a minor, received a sentence under the Youths Offenders Act, 18 U.S.C.A. § 5005 et seq. The heavy sentence received by Chase was due in part at least to the fact that Chase refused to testify before the pleas of guilty were entered. The United States Attorney told the Court that Chase was uncooperative, and urged that a sentence of from twenty to twenty-five years be imposed.

Several months after the sentencing, Chase and Hilliard were brought from prison to the City of Springfield, Illinois. They had been summoned to testify before a federal grand jury which was investigating three bank robberies in Illinois which had been committed respectively, in the months of April, May and August, 1958. These were the robberies to which the defendants had previously entered pleas of guilty. Defendants appeared before the grand jury on May 25, 1959, but each refused to testify as to his knowledge of the bank robberies, claiming that to do so might tend to incriminate him.

The following day each defendant was brought before a District Judge who was informed the defendants desired to have their attorneys present. Neither of the two attorneys who represented the defendants resided in the City of Springfield. The Judge said he would continue the matter, but before doing so, a stenographer of the United States Attorney's office was sworn and testified from her shorthand notes as to the questions put to each defendant before the grand jury and the answers thereto. The Court then inquired if the defendants would be willing to testify before the grand jury as to the three bank robberies, and each answered in the negative on the ground that such answers might tend to incriminate him. The Court continued the matter until June 2, 1959, and defendants were instructed to contact their attorneys and advise them of the date of the hearing. Defendants were confined to jail, but the mother of one of the defendants did contact one of the attorneys. She claimed that she had received the information as to the date of the hearing from the mother of the other defendant. This attorney claimed to have had an agreement with the United States Attorney that the latter would notify him when any hearing date was set, and he ignored the information conveyed to him. The result was that at the June 2nd hearing, neither attorney was present, and no other attorneys appeared for them.

It was clearly evident from the questions asked defendants by the United States Attorney and his assistants that such officials were attempting to have defendants testify that at least two other persons were involved with them as accomplices in the bank robberies. A large number of questions was asked of the defendants by the United States Attorney and his assistants of which the following are samples:

"It might incriminate you with what?"

"Do you think it might incriminate you, that is not your true reason, is it?"

"Haven't you another reason? Isn't that true?"

"Your reason isn't self incrimination or fear. Your reason is something else, isn't that true?"

Each defendant continued to refuse to testify on the ground that to do so might tend to incriminate him.

The Judge ascertained that neither defendant would agree to testify before the grand jury; he found each of them guilty of contempt, and entered judgment that each of them be committed to jail for one year, the service of such sentence to commence at the expiration of the sentence which had been previously imposed. Each judgment contained a provision that defendant could purge himself of the contempt within a reasonable time.

After consultation with counsel, each defendant filed a petition for leave to purge himself of the contempt, and each defendant, on July 30, 1959, again appeared before the grand jury and offered to testify as to any facts in reference to the investigation then being conducted except any questions which might incriminate him concerning federal offenses other than the specific offenses of which the defendant stood convicted. Each defendant testified in detail as to his own activities and participation in the bank robberies, but refused to identify any other person as an accomplice. As to all such questions, each defendant invoked the privilege against self-incrimination. Thereafter, the Court held a hearing. Counsel for defendants presented arguments and authorities. The Court announced its decision that defendants had not purged themselves of the original conviction of contempt.

Defendants urge upon this appeal that the District Judge was prejudiced against them because of their prior conviction. Also, that he was under a misapprehension as to their right to invoke the self-incrimination clause of the Fifth Amendment.

In his opinion on September 3, 1959, the Court said: "Well, gentlemen, the old familiar friend, the Fifth Amendment, is again invoked for the protection of confessed criminals. It is an old story the country over the last few years. The criminal has procured a great friend in the Fifth Amendment."

A further statement by the trial judge was: "Honesty, decency and truth are being ridiculed by the lawless and in some instances, (not in our case) by the unscrupulous lawyers for the lawless; all under the supposed cloak of the Fifth Amendment." He further said: "Is it not time for thoughtful persons to become aroused if the administration of justice is not to be taken over by the lawless? In my judgment, the simplest kind of decency and honesty require a stricter and a more reasonable interpretation and application of the Fifth Amendment than has heretofore been accorded it by some courts." In his revised opinion, the Judge commented upon the all too liberal interpretations placed on the Fifth Amendment by some Courts.

The Judge's statements from the bench clearly indicate that at least as a general proposition, he objected to the privilege of the self-incrimination clause of the Fifth Amendment being claimed by persons who had been convicted of crime. He referred to such persons as "the lawless." He also disagreed with the decisions of "some courts" which had given a liberal or broad interpretation to the self-incrimination clause.

 It is well established that the rights and privileges under, and the protection of the Fifth Amendment of the Constitution of the United States extend to the guilty as well as to the innocent. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; Isaacs v. United States, 8 Cir., 1958, 256 F.2d 654; Brock v. United States, 5 Cir., 1955, 223 F.2d 681; Helton v. United States, 5 Cir., 1955, 221 F.2d 338. The Court of Appeals of the Second Circuit in United States v. Miranti, 253 F.2d 135, 141, stated the rule succinctly: "But the Constitution is for the despicable as well as for the admirable."

One of the recent decisions of the United States Supreme Court which dis-

cusses the proper approach courts should take on this question is Ullmann v. United States, 1955, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511. The Court there stated, 350 U.S. at page 426, 76 S.Ct. at page 500:

"It is relevant to define explicitly the spirit in which the Fifth Amendment's privilege against self-incrimination should be approached. This command of the Fifth Amendment ('nor shall any person * * * be compelled in any criminal case to be a witness against himself * * *') registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.' Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit. Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege. Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice. * * * "

In the same opinion, the Court said, 350 U.S. at page 428, 76 S.Ct. at page 501: "No doubt the constitutional privilege may, on occasion, save a guilty man from his just deserts. It is aimed at a more far-reaching evil * * *. Having had much experience with a tendency in human nature to abuse power, the Founders sought to close the doors against like future abuses by law-enforcing agencies."

In Ullmann, the Court quoted with approval from a decision of the Court of Appeals of the First Circuit, Maffie v. United States, 209 F.2d 225, 227, an opinion written by Chief Judge Magruder: "Our forefathers, when they wrote this provision into the Fifth Amendment of the Constitution, had in mind a lot of history which has been largely forgotten today * * *. They made a judgment and expressed it in our fundamental law, that it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused. The privilege against self-incrimination serves as a protection to the innocent as well as to the guilty, and we have been admonished that it should be given a liberal application. * * * If it be thought that the privilege is outmoded in the conditions of this modern age, then the thing to do is to take it out of the Constitution, not to whittle it down by the subtle encroachments of judicial opinion."

It has been repeatedly urged that the liberal interpretation given to the privilege clause would greatly interfere with the apprehension of criminals, but the Supreme Court has refused to modify or change its attitude as the result of such arguments.

In Hoffman v. United States, 341 U.S. 479, 489–490, 71 S.Ct. 814, 819, 95 L. Ed. 1118, the Court stated: "If this result adds to the burden of diligence and efficiency resting on enforcement authorities, any other conclusion would seriously compromise an important constitutional liberty. 'The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime.' United States v. White, 322 U.S. 694, 698 [64 S.Ct. 1248, 1251, 88 L.Ed. 1542] (1944)."

■ The government argues it was for the Court to determine whether the privilege was properly invoked. This, of course, is true as a general statement, but the trial judge does not have unlim-

ited discretion in that respect. He must view the claim for privilege in the light of the rules and decisions of the Supreme Court. In Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, the Court said: " * * * To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might* be dangerous because injurious disclosure *could result*." (Emphasis supplied.)

■ It is clear that the approach of the learned District Judge to the claim of the defendant to the privilege against self-incrimination was contrary to the admonitions and decisions of the Supreme Court as well as to the decisions of many other federal courts. We do not know what courts the judge had in mind when he leveled his criticism against their liberal interpretation of the self-incrimination clause. In any event, the District Courts as well as the Courts of Appeals must follow the decisions and interpretations of our highest court in spite of any individual predilictions that may exist.

■ It is not necessary that the answers called for would, in themselves, support a conviction for a federal crime. In Blau v. United States, 340 U.S. 159, at page 161, 71 S.Ct. 223, at page 224, 95 L.Ed. 170 the Court said: " * * * Whether such admissions by themselves would support a conviction under a criminal statute is immaterial. Answers to the questions asked by the grand jury would have furnished a link in the chain of evidence needed in a prosecution of petitioner for violation of (or conspiracy to violate) the Smith Act [18 U.S.C.A. § 2385]. Prior decisions of this Court have clearly established that under such circumstances, the Constitution gives a witness the privilege of remaining silent. The attempt by the courts below to compel petitioner to testify runs counter to the Fifth Amendment as it has been interpreted from the beginning. * * * "

■ A number of the questions asked by the United States Attorney or his Assistants were improper. As an illustration, the question: "It might incriminate you with what?" This point was discussed by the Supreme Court in Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, where the Court said: "However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee."

■ In two instances, the United States Attorney attempted to have defendant Chase affirm, under oath, statements which he was alleged to have previously given while not under oath. Chase was justified in claiming the privilege against self-incrimination even though such statements, if voluntarily made, could have been used against him upon a trial. It has been held that such a previous admission does not constitute a waiver of the witness' privilege against self-incrimination. United States v. Miranti, 2 Cir., 253 F.2d 135, 139.

Of course, defendants had immunity as to the offenses of which they had been previously convicted. These were embraced in two sections of the Bank Robbery Act, but there were additional sections of that Act under which they had not been prosecuted. Also, a determined effort was made by the prosecuting attorneys to have defendants implicate others in the robberies. If the prosecution so desired, there appears no reason why a charge of "conspiracy" could not have been brought. This would have been the converse of United States v. Miranti where convictions for conspiracy had been obtained, but there was no prosecution of the substantive crimes such as obstructing justice or aiding a fugitive felon to escape across state lines.

In Miranti, as here, the government's attorneys indicated they had no present

intention to prosecute the defendants concerned for other crimes. The Court of Appeals in United States v. Miranti, 253 F.2d 135, 139, said: "We are thus faced with the novel question whether or not a witness can invoke his privilege against self-incrimination where practically there is only a slight possibility of prosecution." The Court then stated: "We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute."

The government suggests that the defendants waived their privilege when they returned to the grand jury room the second time under the Court's demand that they testify fully and truthfully concerning their knowledge of the bank robbery. They rely on the case of Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344.

 The Rogers case was a five to three decision. It has been frequently criticized.[1] It is extremely doubtful that the holding in Rogers would be followed by the present Supreme Court. Nevertheless, if the Rogers decision is applicable to the situation before us, we must follow that decision, at least until such time as the Supreme Court may overrule it.

We think the Rogers case can be distinguished. In Rogers, the witness at first freely answered all questions about her connection with the Communist Party, but claimed the privilege after questions were directed as to certain records. Here, each defendant claimed the privilege from the very beginning, and as a result, each was found guilty of contempt and given a prison sentence. After advising with counsel, each agreed to go before the grand jury and testify except as to those questions which might incriminate him concerning federal offenses other than the specific offenses of which he stood convicted. Certainly, every possible precaution was taken to avoid a waiver. We have no desire to extend the rule of the Rogers case to include the situation at bar. We hold that under the circumstances of this case, defendants Chase and Hilliard did not waive their right to invoke the privilege against self-incrimination.

The judgment of conviction for contempt against defendants Chase and Hilliard is reversed. The one year sentences imposed upon Chase and Hilliard for contempt are each vacated and set aside.

Judgment of contempt is

Reversed.

---

1. Dean Erwin N. Griswold said: "My own view is that this decision was not soundly reasoned, and that it has led to unfortunate results." Griswold, "The Fifth Amendment Today," page 23.