373 F.2d 622
 In the Matter of U. S. HOFFMAN CAN CORP., a Corporation of the State of New York, and Commercial Can Corp., a Corporation of the State of New Jersey, Bankrupts.
Robert Hirsch and Harold Roth, Appellants.
 No. 15985.
 United States Court of Appeals Third Circuit.
 Argued December 1, 1966.
 Decided March 10, 1967.
 
 COPYRIGHT MATERIAL OMITTED Frederic C. Ritger, Jr., Newark, N. J. (Van Riper & Belmont, Charles E. Villanueva, Newark, N. J., on the brief), for appellants.
 Max L. Rosenstein, Newark, N. J., for appellee.
 Before SMITH, FREEDMAN and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 FREEDMAN, Circuit Judge.
 
 
 1
 This appeal concerns the contention of officers of bankrupt corporations that the privilege against self-incrimination justifies their refusal to file a statement of affairs of the bankrupts with verified supporting schedules.
 
 
 2
 On July 13, 1965 U. S. Hoffman Can Corp., and its subsidiary Commercial Can Corp., were adjudicated bankrupt on an involuntary petition. The Referee ordered three officers of the corporations, Roth, the Chairman of the Board of Directors, and Hirsch, the Secretary, who are the appellants, and Irving Holtz, the President, to prepare and file a statement of affairs with supporting schedules for the bankrupt corporations. Such an order is authorized by § 7(b) of the Bankruptcy Act (11 U.S.C. 25(b)) which provides: "where the bankrupt is a corporation, its officers, the members of its board of directors or trustees or of other similar controlling bodies, its stockholders or members, or such of them as may be designated by the court, shall perform the duties imposed upon the bankrupt by this title."
 
 
 3
 Appellants tendered a statement of affairs and schedule of assets and liabilities but they were unsigned and unverified, contrary to the requirements of § 7(a) (8), (9) of the Bankruptcy Act (11 U.S.C. § 25(a) (8), (9))[1] and the General Orders in Bankruptcy.[2] The Referee therefore refused to receive the documents for filing and initiated contempt proceedings against the three officers which in due course were brought before the district court. After a hearing the district judge held that the officers had not demonstrated adequate justification for their refusal to obey the Referee's order and therefore ordered the officers, Roth, Hirsch and Holtz, to prepare, swear to and file with the court the statement of affairs and supporting schedules of assets and liabilities of the bankrupt corporations. In response to the officers' claims that compelling them to file verified schedules would violate their privilege not to incriminate themselves, the district judge expressly provided that his order was to be without prejudice to the right of any of them to claim his privilege against self-incrimination. The order further provided that any officer claiming the privilege of self-incrimination must file with the court "in a sealed envelope, a statement by his counsel setting forth the basis upon which the privilege against self-incrimination is invoked. Said sealed envelope shall be for the use of the Court only."[3] Appropriate action was reserved until after the judge had considered the contents of the envelopes.
 
 
 4
 Holtz agreed to comply with the order, but appellants, Roth and Hirsch, refused to do so on counsel's advice that they might incriminate themselves or waive their privilege against self-incrimination under the Fifth Amendment. The district court thereupon adjudged Roth and Hirsch in contempt of court and imposed the sentences from which this appeal is taken. Execution of sentence was stayed pending the appeal.
 
 I.
 
 5
 A number of contentions must be disposed of before we reach the main issues in the case.
 
 
 6
 1. Appellants are not immune from possible criminal proceedings because of § 7(a) (10) of the Bankruptcy Act (11 U.S.C. § 25(a) (10)), which invests a bankrupt with immunity from criminal proceedings because of "testimony" given by him during his examination at the first meeting of creditors. The provision is inapplicable to the statement of affairs and the accompanying schedules of assets and liabilities, for under its settled construction the immunity refers only to testimony given in oral evidence and not to verified instruments filed with the court. 1 Collier, Bankruptcy (14th ed. 1966), ¶ 7.13. "It was reasonable for Congress to make a distinction between the schedule, which may presumably be prepared at leisure and scrutinized by the bankrupt with care before he verifies it, and the testimony that he is to give when he submits to an examination at a meeting of creditors or at other times pursuant to the order of the court — a proceeding more or less unfriendly and inquisitorial, as well as summary, and in which it may be presumed that even an honest bankrupt might, through confusion or want of caution, be betrayed into making admissions that he would not deliberately make." Ensign v. Commonwealth of Pennsylvania, 227 U.S. 592, 599-600, 33 S.Ct. 321, 323, 57 L.Ed. 658 (1913). See also Slakoff v. United States, 8 F.2d 9, 10 (3 Cir. 1925).
 
 
 7
 2. Appellants are not relieved of their duty under the Bankruptcy Act because, as they argue, the Referee could have called on the petitioning creditors[4] or could have appointed a qualified accountant[5] to prepare and file the necessary information. The Bankruptcy Court was entitled to have from the appellants themselves as officers of the corporation the requisite information, which may well have differed from that which would have been available from creditors or accountants.
 
 
 8
 3. Holtz's compliance with the court's order does not relieve appellants of their duty. Section 7(b) of the Bankruptcy Act (11 U.S.C. § 25(b)) authorizes the Bankruptcy Court to designate who among the officers, directors and stockholders of a corporation shall prepare and file on its behalf the requisite documents. The privilege against self-incrimination is applicable to all those designated by the court and, subject to it, all those whom the court designates must comply with the court's order. It is no excuse for their noncompliance that others have obeyed the order of the court. Each one may have information which none of the others possesses, and the Bankruptcy Court is entitled to the complete information which all of them combined may reveal.
 
 
 9
 4. Equally unavailing is the claim that the remedy of contempt to compel the filing of these documents is unnecessary because of the existence of the penalty of denial of a discharge in bankruptcy. The remedy of contempt seeks to enforce compliance, whereas the refusal of a discharge is a penalty for improper conduct. The contention is particularly unconvincing in the present case which involves bankrupt corporations. Here the denial of a discharge in bankruptcy would be lacking even in any indirect coercive quality since the corporate bankrupts are out of business and a discharge would be meaningless to them.
 
 II.
 
 10
 We are thus brought to the contention of appellants that to require an answer to any of the numerous questions on the eleven schedules would violate their constitutional rights, since such a course would single out areas of inquiry which might provide incriminating evidence to the authorities.
 
 
 11
 It was established many years ago that a complete refusal by a bankrupt to file the schedules required under § 7 of the Bankruptcy Act is unjustifiable, and that a naked statement even under oath that the schedules may prove incriminating is not enough to justify noncompliance with the statutory requirement. In Re Arend, 286 F. 516 (2 Cir. 1922); cf. Podolin v. Lesher Warner Dry Goods Co., 210 F. 97 (3 Cir. 1914). Although the protection against self-incrimination has been broadened since that decision,[6] we think this result is still sound. Thus, in United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), the Supreme Court held that a taxpayer was not excused from filing an income tax return because his income was derived from illicit traffic in liquor. "If", said Mr. Justice Holmes, "the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on that account refuse to make any return at all. * * * Most of the items warranted no complaint. It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime. But if the defendant desired to test that or any other point he should have tested it in the return so that it could be passed upon. He could not draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law." (263-264, 47 S.Ct. 607). In a recent re-examination of the Sullivan case in Albertson v. Subversive Activities Control Board, 382 U.S. 70, 79, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), the Court pointed out that it was based on two grounds: (1) a claim of self-incrimination against every question on the tax return or on the mere submission of the return would be "virtually frivolous"; and (2) to honor the claim of privilege not asserted at the time the return was due would make the taxpayer rather than a tribunal the final arbiter of the merits of the claim of privilege. In Albertson the Subversive Activities Control Board required registration by individual members of the Communist Party when the Party itself refused to register under the Subversive Activities Control Act of 1950. The Court upheld the refusal of individual members of the Communist Party to answer any of the questions on the registration form because the area of inquiry was permeated with criminal statutes and responses to any of the questions in the form might involve the member in the admission of a crucial element of a crime. 382 U.S. at 79, 86 S.Ct. 194.
 
 
 12
 Here, absent special circumstances not yet revealed, it appears that many of the numerous items of information required by the schedules could not possibly be incriminating no matter how broadly the privilege is construed.[7] Appellants, on the present record, therefore were not justified in refusing altogether to supply any of the information required by the schedules and statement of affairs of the corporations of which they were officers.
 
 III.
 
 13
 This brings us to the procedure adopted by the district court. The court ordered appellants to file a statement of affairs and supporting schedules of assets and liabilities of the bankrupt corporations, without prejudice to their right to claim the privilege against self-incrimination. The right was broadly recognized to cover "any answer or disclosure which would make actual incrimination or possible incrimination, including any answer or disclosure that would supply any link in the chain of evidence needed to prosecute any of the Respondents of any crime." So far the order gave clear recognition to the rights of the appellants.
 
 
 14
 The district court, however, then went on to follow the procedure first adopted in In Re Mutual Security Savings & Loan Ass'n, Inc., 214 F.Supp. 877 (D.Md. 1963) and followed in In the Matter of John Lakis, Inc., 228 F.Supp. 918 (S.D. N.Y.1964), and required a party who claimed the privilege of self-incrimination "to file with the Court, in a sealed envelope, a statement by his counsel setting forth the basis upon which the privilege against self-incrimination is invoked. Said sealed envelope shall be for the use of the Court only." The order provided that the court would take appropriate action on notice to the parties, after it had considered the contents of the envelopes.[8]
 
 
 15
 We hold this procedure to be improper and violative of appellants' constitutional rights. The claim of the privilege against self-incrimination is fraught with difficulties for which the courts have sought to make adequate provision. Thus, where the incriminating effect of a direct answer is involved, then, as Chief Justice Marshall said over 150 years ago in the famous case against Aaron Burr, "it belongs [first] to the court to consider and to decide whether any direct answer * * * can implicate the witness. If this be decided in the negative, then he may answer * * * without violating the privilege which is secured to him by law. If a direct answer * * * may criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. It follows necessarily then, from this statement of things, that if the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not." United States v. Burr, 25 Fed.Cas. pp. 38, 40; No. 14,692e (C.C.Va.1807). To the extent that the order of the court below required a statement in the sealed envelope of the "basis" on which the privilege was invoked in cases where a direct answer might incriminate the party, the procedure violated this well-settled rule.
 
 
 16
 Moreover, as the court below recognized, the privilege also embraces those answers "which would furnish a link in the chain of evidence needed to prosecute" the person making the statement. Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); Malloy v. Hogan, 378 U.S. 1, 11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). As a result a heavy duty rests on the judge before whom the privilege is invoked. As Chief Judge Biggs said in American Cyanamid Company v. Sharff, 309 F.2d 790, 798 (3 Cir. 1962): "The trial court should not deem itself to be `a mere keeper of the ring' in the tradition of the English civil law." The judge must consider "the implications of the question, in the setting in which it is asked." And if in these circumstances it is evident "that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result," the privilege must be sustained. Indeed, the Supreme Court has declared that an answer may be compelled only if "it clearly appears to the court that [a witness] * * * is mistaken" in fearing incrimination, and "in appraising the claim" the trial judge "`must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" Hoffman v. United States, supra, at 341 U.S. 486-487, 71 S.Ct. at 818.
 
 
 17
 It follows from this that the invocation of the privilege should be made in the presence of the trial judge. A statement filed with the court in which the basis for the claim of privilege is set forth, is an inadequate means for carrying out the affirmative duty of the judge to safeguard the constitutional privilege when it is invoked and to be guided in making his determination by his personal perception of the peculiarities of the case in the light of the surrounding circumstances. However appropriate such a procedure might be in other cases, it is inadequate as an instrumentality for judicially adjudicating claims of self-incrimination. Such claims peculiarly require a judgment based upon a delicate weighing of all the surrounding circumstances.
 
 
 18
 Moreover, even where the judge has properly surveyed the entire setting of the case and has concluded that there is no danger of incrimination, his task is not completed. If a claim of privilege is still asserted, the judge must permit some further showing of possible incrimination before he can dispose of the claim. American Cyanamid Company v. Sharff, supra 309 F.2d at 794; United States v. Coffey, 198 F.2d 438 (3 Cir. 1952); United States v. Weisman, 111 F.2d 260 (2 Cir. 1940). Even then, a claimant can only be required to move forward to the limited extent requisite to make it known to a perceptive judgment that he has reached a risk of disclosure which should be avoided, lest in establishing his right to the constitutional safeguard he says enough to destroy it. As Judge Learned Hand said in United States v. Weisman, supra, at 262: "Logically, indeed, he is boxed in a paradox, for he must prove the criminatory character of what it is his privilege to suppress just because it is criminatory. The only practicable solution is to be content with the door's being set a little ajar, and while at times this no doubt partially destroys the privilege, and at times it permits the suppression of competent evidence, nothing better is available." To make the delicate determination when the minimal push on the door has admitted enough light to adjudge that the privilege is properly claimed and when more is required, cannot be done by the absolutist method of a written statement filed with the court.
 
 
 19
 Moreover, invocation of the privilege against self-incrimination should not be channeled into a procedure which requires statements to be filed in secrecy with the court. Such a practice is bound ultimately to beget a requirement of the maximum disclosure to prove the right to the privilege, in contrast to a proceeding in open court where the disclosure may be interpreted at the point where the right to the privilege becomes clear to the judge. In any event, the history of the privilege itself contains its own condemnation of a procedure in camera. See 8 Wigmore, Evidence (McNaughton rev. 1961) § 2250.
 
 
 20
 In the present case it already appears that the Federal Bureau of Investigation had examined the records of the bankrupt corporations and the personal conduct of the appellants, and that it had interviewed members of their families regarding the affairs of the corporations. This alone should have been sufficient to indicate to the court that compelling answers to some of the questions on the various schedules would have violated appellants' privilege against self-incrimination. Of course, we will not at this time undertake to decide which of the many questions were subject to a legitimate invocation of the privilege. The availability of the privilege is in the first instance for the trial judge to determine, since he is closest to the evidence. In addition, much time has passed since this case was before the district judge, and new facts bearing on, and possibly extending, the availability of the privilege might now be known or brought to his attention. Indeed, it is conceded that some two months after the district court had adjudicated the appellants in contempt, appellant Roth was indicted by the grand jury in the Southern District of New York for certain stock transactions which might be relevant here.
 
 
 21
 Since the order upon whose violation the appellants were adjudged guilty of contempt prescribed an improper and unconstitutional procedure the judgment will be vacated and the cause remanded to the court below with direction to proceed in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 "The bankrupt shall * * * (8) prepare, make oath to, and file in court within five days after adjudication, if an involuntary bankrupt, and with his petition, if a voluntary bankrupt, a schedule of his property, showing the amount and kind of property, the location thereof and its money value, in detail; and a list of all his creditors, including all persons asserting contingent, unliquidated, or disputed claims, showing their residences or places of business, if known, or if unknown that fact to be stated, the amount due to or claimed by each of them, the consideration thereof, the security held by them, if any, and what claims, if any, are contingent, unliquidated or disputed; and a claim for such exemptions as he may be entitled to; all in triplicate, one copy for the clerk, one for the referee, and one for the trustee: Provided, however, That the court may for cause shown grant further time for the filing of such schedules if, with his petition in a voluntary proceeding or with his application to have such time extended in an involuntary proceeding, the bankrupt files a list of all such creditors and their addresses; (9) file in triplicate with the court at least five days prior to the first meeting of his creditors a statement of his affairs in such form as may be prescribed by the Supreme Court. * * *"
 
 
 [2]
 The schedules are prescribed by the General Orders, and are set out in 5 Collier, Bankruptcy (14th ed. 1965), pp. 2809-19. See also The Statement of Affairs, Official Form No. 2, 5 Collier, Bankruptcy (14th ed. 1965), pp. 2891-95
 There are 11 schedules which the bankrupt is required to file; five of them concern its debts, while the remaining six relate to its property. The information required by the schedules is quite detailed, in accord with the statutory purpose of assuring a complete account of the bankrupt's financial situation.
 
 
 [3]
 The order also provided: "After the contents of the envelopes and the statements furnished have been examined by the Court, the same will be again placed in envelopes and sealed by the Court, to the end that said contents and statements may be examined by the United States Court of Appeals in the event the disposition of the matter by this Court is not satisfactory to any of the parties concerned."
 
 
 [4]
 Under General Order in Bankruptcy No. 9
 
 
 [5]
 Under § 39(a) (2) of the Bankruptcy Act (11 U.S.C. § 67(a) (2))
 
 
 [6]
 E. g., Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). See also the discussion in United States v. Coffey, 198 F.2d 438 (3 Cir. 1952)
 
 
 [7]
 Thus, for example, it does not appear how, in the absence of further evidence, appellants might have been endangered by disclosing how many horses, cows, sheep, and other animals were owned by the bankrupt (Schedule B-2), how much they had paid to counsel for services in the bankruptcy proceedings (Schedule B-4), or any of the information required by Schedule B-5, relating to property exempt from the Bankruptcy Act
 
 
 [8]
 See supra n. 3