UNITED STATES of America,
Plaintiff-Appellee,

v.

Ivan MELCHOR MORENO and
Rigoberto Melchor Moreno,
Defendants-Appellants.

No. 75–2957.

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1976.

Wayne Windle, El Paso, Tex., for Roberto Moreno.

Dan L. Armstrong, El Paso, Tex., for Ivan Moreno.

John Clark, U. S. Atty., San Antonio, Tex., Ronald F. Ederer, Mike Milligan, Asst.

U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before WISDOM,* GODBOLD and LIVELY,** Circuit Judges.

GODBOLD, Circuit Judge:

Rigoberto Melchor Moreno and his brother Ivan Melchor Moreno appeal from convictions on four narcotics charges. The principal issue they raise is a novel one. The prosecution informed the court that an individual subpoenaed by the defense, and called as a witness by the defense, would assert his Fifth Amendment privilege. In passing on the validity of the privilege, the trial judge held an *in camera* conference with the prospective witness, refusing to allow defense attorneys to attend. After the conference the judge announced in open court that he would sustain the privilege and bar all testimony by the witness. The defendants ask us to hold that this procedure deprived them of a fair trial. We decline to do so but nevertheless reverse because we find that the privilege was sustained too broadly.

## I

The Melchor brothers are Mexican nationals. In 1974 Rigoberto was living as a rancher, farmer, and trucker in Mexico. On September 16, Guillermo Botello, Rigoberto's partner in various ventures, including the ownership of an aircraft, introduced him to an individual whom we will call Roe.[1] The three made arrangements to bring a large shipment of marijuana into the United States. Rigoberto was to obtain the marijuana from local growers, and Botello was to bring it across the border in the jointly-owned airplane and make delivery to Roe in the United States. Rigoberto per-

---

* Judge Wisdom was a member of the panel that heard oral arguments but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

** Of the Sixth Circuit, sitting by designation.

1. Throughout this case the prosecution has sought to conceal Roe's identity because of his service to the government as an informer. The trial court cooperated, and we see no reason to use the name here.

formed his agreed part in the deal, but the transaction was aborted in October. The marijuana was seized near Ft. Worth, and Roe and others were arrested.

In January 1975, according to the testimony of government agents at the Melchors' trial, Roe began to work closely with the Drug Enforcement Administration (DEA) as an informer. DEA agents promised him that whatever assistance he gave the agency would be made known to the sentencing judge when the Ft. Worth episode came up for trial.

Roe contacted Rigoberto on March 25, 1975, to propose a heroin transaction. Rigoberto said that he would send his brother Ivan to discuss the matter. Ivan met with Roe several times on the following day. During these meetings Roe introduced Ivan to Joaquin Legaretta, an undercover agent for the DEA. A deal was struck, and on March 29 Rigoberto arranged to send to El Paso 2000 grams of heroin concealed under the dashboard of a station wagon driven by Ivan.[2] That day Rigoberto and Ivan met with Legaretta and John Comey, another DEA agent, at a hotel in El Paso. Legaretta displayed a large quantity of government cash, Rigoberto produced the heroin, and an arrest followed.

A grand jury returned a four-count indictment against the brothers, charging them with conspiring to import heroin (21 U.S.C. § 963), importing heroin (*id.* §§ 952(a), 960(a)(1) ), conspiring to possess heroin with intent to distribute (*id.* § 846), and possessing heroin with intent to distribute (*id.* § 841(a)(1) ).

At trial the Melchors raised an entrapment defense and sought to call Roe as their first witness. The defendants were acquainted with Roe, of course, having had dealings with him for several months. At the time of trial, according to undisputed evidence, they had his telephone number and the numbers of persons who knew him. Although Roe had responded to the defense's subpoena and was available for tes-

timony, the government informed the court that Roe would assert his self-incrimination privilege and should not be called to the stand. The District Judge ruled that he would conduct an *in camera* hearing to determine whether or not Roe's Fifth Amendment claims were valid. The defense attorneys asked permission to attend this hearing to participate in the court's determination, but the request was denied. The District Judge conducted a lengthy interview with Roe. A transcript thereof was made and preserved under seal for review by this court. After the interview the District Judge announced in open court his decision that Roe could not testify without incriminating himself and thus would not have to take the stand.

In Roe's absence, the principal defense witnesses were the brothers themselves. With the support of character witnesses, they attempted to portray themselves as basically honest men who had obeyed the law all their lives, with the above described exceptions. Rigoberto testified that after the marijuana deal had fallen through he had felt depressed and ashamed and had resolved to avoid any further involvement with the drug traffic. He testified that he had put aside his reluctance and participated in the heroin transaction only because of Roe's persistent requests and pleas of hardship.

Ivan's story was that he had had little understanding of what was happening and that he had participated in the activities noted above solely because his brother had asked him to.

The jury found Rigoberto and Ivan guilty on all counts. The judge imposed partly consecutive and partly concurrent sentences totalling 30 years' imprisonment for each defendant.

## II

 If the District Court's refusal to allow the defendants to call a material witness to the stand lacked some affirmative

---

2. Both brothers testified that Ivan did not know the drugs were in the car. Evidently the jury did not believe them.

justification, it was a violation of the defendants' constitutional rights. In *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967), the Supreme Court spelled out the significance of the Sixth Amendment right of the accused "to have compulsory process for obtaining witnesses in his favor." The Court noted: "The right to offer testimony of witnesses, and compel their attendance, if necessary, is in plain terms the right to present a defense." [3] The Sixth Amendment's policy is reinforced by the broad requirement of fundamental fairness that the due process clause of the Fourteenth Amendment imposes. In *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1949, 35 L.Ed.2d 297, 312 (1973), the Supreme Court said, in the course of a discussion of due process: "Few rights are more fundamental than that of an accused to present witnesses in his own defense."

The District Court's Fifth Amendment decision, if correct, would provide the requisite justification for excluding Roe's testimony. *U. S. v. Gloria,* 494 F.2d 477 (CA5), *cert. denied,* 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974); *U. S. v. Lacouture,* 495 F.2d 1237 (CA5), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974).[4] But the defendants are in a difficult position. They cannot challenge the substance of the Fifth Amendment ruling because they did not hear what the judge heard. Thus they take the position that they should have been allowed to participate in the Fifth Amendment hearing, cross-examining Roe if necessary and urging the judge to overrule the privilege claim to the extent, if any, that it was frivolous.

The District Judge's method of deciding the privilege claim must be evaluated within the context of the broad approach outlined by the Supreme Court in *Hoffman v. U. S.,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). *Hoffman* attempts to resolve a dilemma that arises in many privilege situations. The courts cannot accept Fifth Amendment claims at face value, because that would allow witnesses to assert the privilege where the risk of self-incrimination was remote or even nonexistent, thus obstructing the functions of the courts. The applicability of the privilege is ultimately a matter for the court to decide. On the other hand, "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. at 1124. Thus a practice has developed whereby, outside the presence of the jury, the witness will allude in very general, circumstantial terms to the reasons why he feels he might be incriminated by answering a given question. The judge examines him only far enough to determine whether there is reasonable ground to apprehend danger to the witness from his being compelled to answer. If the danger *might* exist, the court must uphold the privilege without requiring the witness to demonstrate that a response *would* incriminate him, the latter inquiry being barred by the privilege itself. As the Court in *Hoffman* phrased it:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial

---

**3.** Despite the limitations of its wording, the Amendment is held to embrace not only the right to bring witnesses to the courtroom, but also, in appropriate circumstances, the right to put them on the stand. As the Court in *Washington* said, "[t]he Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." 388 U.S. at 23, 87 S.Ct. at 1925, 18 L.Ed.2d at 1025.

**4.** *Lacouture* held that where a witness's self-incrimination privilege protected her from having to give any of the testimony the defense wanted, the defense had no right to put her on the stand merely so that the jury could see her assert her claim of privilege.

judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence."

341 U.S. at 486–87, 71 S.Ct. at 818, 95 L.Ed. at 1124. This general approach to adjudication of the self-incrimination privilege has been followed by this circuit in numerous opinions.[5]

It is clear that the District Judge here was correct in passing upon Roe's privilege claim in the absence of the jury, *U. S. v. Gomez-Rojas*, 507 F.2d 1213, 1220 (CA5, 1975), but it is by no means clear that he was correct in excluding everyone else as well. There is very little authority on this question. In a few reported cases an individual has been directed to make the showing contemplated by *Hoffman* through an *in camera* presentation. *U. S. v. Curcio*, 234 F.2d 470 (CA2, 1956), *rev'd on other grounds*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); *In re John Lakis, Inc.*, 228 F.Supp. 918 (S.D.N.Y., 1964); *In re Mutual Security Savings & Loan Ass'n*, 214 F.Supp. 877 (D.Md., 1963). These cases, however, contain little or no analysis of the pros and cons of the procedure involved.[6]

On the other hand, the Third Circuit has expressed fears that *in camera* proceedings could violate the witness's Fifth Amendment rights. *In re U. S. Hoffman Can Corp.*, 373 F.2d 622 (CA3, 1967). The appellants in *U. S. Hoffman Can Corp.* had resisted, on Fifth Amendment grounds, disclosure of financial information. The District Court ordered them to submit a sealed statement explaining the basis for their claim. The Court of Appeals held that in circumstances where the appellants proved that a direct answer might be incriminating, the judge could make no further inquiry. A procedure involving sealed statements, the court said, "is bound ultimately to beget a requirement of maximum disclosure to prove the right to the privilege, in contrast to a proceeding in open court where the disclosure may be [interrupted] at the point where the right to the privilege becomes clear to the judge. In any event, the history of the privilege itself contains its own condemnation of a procedure in camera." *Id.* at 629.

The issue is not a simple one.[7] This case does not require that we decide it, and we leave it for another day. Pretermitting the

---

**5.** *See, e. g., U. S. v. Malnick*, 489 F.2d 682 (CA5, 1974); *U. S. v. Wilcox*, 450 F.2d 1131, 1136–37 (CA5, 1971), *cert. denied*, 405 U.S. 917, 92 S.Ct. 944, 30 L.Ed.2d 787 (1972); *Kiewel v. U. S.*, 204 F.2d 1 (CA5, 1953).

**6.** Decades ago individuals asserting a self-incrimination privilege in regard to documents would sometimes be ordered or furnish the documents themselves to the court for an *in camera* inspection. Contempt convictions for refusal to comply with such orders were upheld on appeal. *Brown v. U. S.*, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500 (1928); *Consolidated Rendering Co. v. Vermont*, 207 U.S. 541, 28 S.Ct. 178, 52 L.Ed. 327 (1908); *Corretjer v. Draughon*, 88 F.2d 116 (CA1, 1937). It would seem that the authority of these early cases has been weakened by *Hoffman v. U. S.* All of them expressly proceeded on the premise that tolerating the witness's behavior would have totally precluded the court from passing on the privilege issues. *Hoffman v. U. S.* authoritatively promulgated a less drastic method of resolving such issues without full disclosure.

**7.** There are tensions in several directions:

(1) Roe was induced by the judge to discuss his fears of self-incrimination more freely than the judge could have required in open court.

Arguably, as *U. S. Hoffman Can Corp.* suggests, this may have infringed Roe's Fifth Amendment rights. *But compare* cases sustaining immunity statutes on the ground that the Fifth Amendment does not confer an absolute right not to testify about one's crimes but only a right not to be placed in danger of prosecution as the result of such testimony. *Kastigar v. U. S.*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Ullman v. U. S.*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). Possibly the confidentiality of the *in camera* hearing would be deemed to afford security comparable to statutory immunity. In any event, parties ordinarily may "rely only upon constitutional rights which are personal to themselves." *NAACP v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). A procedure whereby statements are improperly elicited from a witness *in camera* would not necessarily injure the defendants who seek his testimony.

(2) There is a general antipathy in our legal system to judicial proceedings behind closed doors. The due process clause embraces to some extent "[t]his nation's accepted practice of guaranteeing a public trial to an accused," *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *see also* Fed.R.Crim.P. 26; 6 Wigmore, Evidence § 1834 (3d ed. 1940). But it

propriety of the procedure, we conclude that the court gave too broad a scope to the privilege as applied to Roe.

## III

In *U. S. v. Gomez-Rojas*, 507 F.2d 1213 (CA5, 1975), this court set forth the basic standards against which the substance of Roe's self-incrimination privilege claim

has never been the law that a person cannot be convicted unless every element of his trial is conducted in public. The courts have recognized that the broad requirement of public judicial proceedings is a flexible one, influenced by particular circumstances. Judges inspect prosecution evidence privately in order to determine whether the Jencks Act, 18 U.S.C. § 3500, or the Constitutions requires the government to release that evidence to the defense. *See U. S. v. Rivero*, 532 F.2d 450 (CA5, 1976). Judges make an *in camera* determination of whether an informant's identity should be disclosed to the defense. *U. S. v. Freund*, 525 F.2d 873 (CA5, 1976).

Parenthetically, we do not agree with the government's argument that *Freund* and its companion case, *U. S. v. Doe*, 525 F.2d 878 (CA5, 1976), "conclusively establish that the trial judge need not allow either the defendant or his lawyer to be present at the in camera hearing with the confidential informant." *Freund* and *Doe* did not establish blanket procedural rules to govern all judicial interviews with informers. Instead, they were concerned with procedures for determining whether the so-called "informer's privilege" should be sustained. We have recently held in *U. S. v. Godkins*, 527 F.2d 1321 (CA5, 1976), that this privilege (which actually is a privilege of the government) may be invoked only when the government seeks to avoid disclosure of an informer's identity; when an accused person wishes to subpoena an individual already known to him, the privilege is irrelevant. "If the identity of the informer is *admitted or known*, then there is no reason for pretended concealment of his identity, and the privilege of secrecy would be merely an artificial obstacle to proof." 8 Wigmore, Evidence § 2374 at 766 (rev. ed. 1961). As we have already pointed out, the defendants knew Roe's identity.

(3) Extraordinary complexity of subject matter and the need to avoid placing a substantial burden on judicial resources may call for the participation of counsel in a determination otherwise suitable for *in camera* inquiry. *See Alderman v. U. S.*, 394 U.S. 165, 182 n. 14, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

(4) Defendants here say that they were entitled to cross-examine Roe to expose possible omissions and flaws in the submission he made to support his privilege. But they cite no case,

must be measured. In that case the defendant Sutherlin pleaded that he had been entrapped by government informer Smith. The informer resisted a defense subpoena by claiming his Fifth Amendment privilege, which the District Court upheld without making any inquiry into the validity of the claim. We held that the court had erred by accepting the informer's assurances at face

and we find none, establishing that they would have had a right to cross-examine Roe if the District Court had passed on his claim in the normal way, in open court. In *U. S. v. Lacouture*, 495 F.2d 1237 (CA5), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974), on which defendants rely, a reluctant witness was examined at a hearing in the judge's chambers, with defense counsel present. But so far as the opinion reveals, the only questions the defense was permitted to ask related to matters at issue in Lacouture's trial, not matters concerning the witness's Fifth Amendment claim. In fact, the opinion narrates how the witness's privilege was invoked and sustained, and in that account the only participants in the discussion were the witness, her own attorney, and the judge.

The usual Sixth Amendment rights of cross-examination were only peripherally at stake here, since the hearing did not relate to guilt but to the collateral issue of whether Roe's privilege was properly invoked. *Cf. U. S. v. Pollard*, 509 F.2d 601, 604 (CA5, 1975). And defendants were not unfairly deprived of a chance to discredit an adverse witness in the jury's eyes, since the jury did not hear Roe testify.

(5) Considered solely from the standpoint of its utility in eliciting relevant testimony, the *in camera* method has both advantages and disadvantages when compared with an inquiry in open court. It perhaps allows an unusually searching inquiry into the proper bounds of the witness's privilege. Under the ordinary procedure a judge is often placed in the position of excluding testimony that would not really incriminate the witness, because he does not know what the witness's answer would be if given. *See Kiewel v. U. S.*, 204 F.2d 1, 4, 6 (CA5, 1953). Behind closed doors, the judge has no need to make such allowance for ignorance. On the other hand, the *in camera* approach tends to deprive courts of the perspective that can be contributed by parties seeking the testimony. The attorneys in the case, having greater familiarity with the details of their clients' evidentiary needs, and also possessing the viewpoint of advocates, may draw the judge's attention to considerations that he himself would have overlooked. *See Dennis v. U. S.*, 384 U.S. 855, 874–75, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

value and sent the case back for a new trial, directing:

On remand, the trial court must hold a hearing to determine whether Smith's fear of self-incrimination is well-founded and what the parameters of his Fifth Amendment rights are in the context of the testimony that Sutherlin wishes to obtain from him. If the court finds that Smith cannot properly invoke the Fifth Amendment with respect to any relevant and material questions which Sutherlin proposes to ask him, then Smith must testify at the new trial. If, on the other hand, the court finds that Smith may legitimately refuse to answer essentially all relevant questions, then the district court must decide in its informed discretion whether, in light of Sutherlin's entrapment defense, Sutherlin should be allowed to elicit Smith's refusal to testify before the jury or to comment on that refusal.

507 F.2d at 1220. In a companion case with virtually identical facts, we remanded for a new trial with instructions that the judge should conduct a "searching inquiry into the validity and extent of [the informer's] Fifth Amendment claims." *U. S. v. Waddell*, 507 F.2d 1226 (CA5, 1975).

■ A witness may not withhold all of the evidence demanded of him merely because some of it is protected from disclosure by the Fifth Amendment. A blanket refusal to testify is unacceptable. A court must make a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded. See, e. g., *U. S. v. Malnick*, 489 F.2d 682 (CA5, 1974); *Daly v. U. S.*, 393 F.2d 873 (CA8, 1968); *Warnell v. U. S.*, 291 F.2d 687 (CA5, 1961). As to each question, the test is whether the witness is confronted with substantial and "real," and not merely trifling or imaginary hazards of incrimination. *Marchetti v. U. S.* , 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Rogers v. U. S.*, 340 U.S. 367, 374, 71 S.Ct. 438, 95 L.Ed. 344 (1941); *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212

(CA8, 1973), *cert. denied*, 414 U.S. 1162, 39 L.Ed.2d 116 (1974). As *Gomez-Rojas* and *Waddell* clearly contemplated, Roe could properly have been excluded from testifying only if the court had found that Roe could "legitimately refuse to answer *essentially all* relevant questions." *Gomez-Rojas*, 507 F.2d at 1220 (emphasis added).

■ The record here does not support any such finding. The sealed transcript indicates that Roe's fears of self-incrimination centered on the possibility that the defense, while probing his motives for becoming an informer, would ask him to discuss circumstances as they existed prior to the heroin transaction underlying the instant prosecution. Such testimony, we may assume for present purposes, might have aided prosecutors in marshalling charges against him. Roe did not, however, explain why the testimony he could give about his negotiations with the Melchors over the heroin sale—the testimony most critical to the Melchors' entrapment contention—would expose him to a risk of prosecution. Since there is a great deal of evidence to suggest that with respect to the heroin deal he was acting in cooperation with DEA agents at least part of the time, we surmise that such a showing would have been difficult to make. In any event, the burden of establishing entitlement to the privilege was his, and he did not carry it as to the entire subject matter of his prospective testimony. Accordingly he should have been called to the witness stand and directed to give at least part of the testimony sought by the defense. Only as to genuinely threatening questions should his silence have been sustained. See *U. S. v. Stephens*, 492 F.2d 1367 (CA6, 1974); *Warnell v. U. S., supra*.

The Second Circuit was recently faced with a situation much like the one before us. *U. S. v. Anglada*, 524 F.2d 296 (CA2, 1976). Anglada was unable to obtain testimony from the informer, who had allegedly entrapped him, because the informer, Santana, had asserted his Fifth Amendment privilege. On appeal the defendant raised a number of arguments against the exclusion,

most if not all of them equally pertinent to the Melchors' situation. He pointed to

> the unique nature of Santana's testimony in establishing the entrapment defense (he was the only other participant in the critical conversation), the protection afforded Santana against a criminal charge in the Anglada transaction because Santana was acting at the Government's request, the lack of connection between the Anglada sale and the state charge [underlying the self-incrimination claim], the possible waiver of his fifth amendment rights by his conversations with the prosecutor, and the possibility that his reluctance to testify was based upon fear of Anglada's retaliation rather than on the fifth amendment.

*Id.* at 300 (footnote omitted). In response the appellate court, which had already decided to reverse the case on unrelated grounds, advised the District Judge that if the situation arose again at Anglada's new trial, he should "take a harder look at any blanket assertion of privilege and also at the possibility of allowing some carefully phrased, limited questions by Anglada's counsel." *Id.*[8]

To complete our analysis of the defendants' compulsory process contention, we look to the materiality and relevancy of the excluded testimony. See *U. S. v. Joseph,* 533 F.2d 282, 284–85 (CA5, 1976). Rigoberto alleged that Roe had tried on numerous occasions to entice him into a heroin transaction, although Rigoberto had at first declared several times that he was uninterested. Roe was the only person who could corroborate or discredit this story. He also played a central role in Ivan's story.[9] The District Judge, after his *in camera* meeting with Roe, expressed the view that Roe's answers "would not be of assistance to the Defendants in their defense of entrapment." It is true that Roe's *in camera* account of his dealings with the Melchors differed in some respects from the brothers' own testimony. But one cannot assume that Roe's account would have stood up under defense examination. And the jury might have given greater credence to the brothers' story if Roe's testimony had corroborated it to some extent.

▮ Trial courts must enjoy wide discretion in resolving a self-incrimination claim,[10] but their discretion is not unlimited. Cf. *U. S. v. Chase,* 281 F.2d 225, 228–29 (CA7, 1960). In this instance the exclusion of Roe's testimony in its entirety rose to the level of constitutional error.

### IV

▮ The government makes what is, in effect, a harmless error contention. As a matter of law, the argument runs, there was no entrapment, so it makes no difference whether or not the exclusion of Roe's testimony was wrong. The government emphasizes (1) that there were no threats and no real coercion directed against the defendants, and (2) that Roe merely set up the transaction and played no part in the events occurring on the day of the arrest.

---

**8.** The District Judge's remarks during his *in camera* conference indicated a belief that Roe might be placed in physical danger if he were to testify. Of course, there is authority to support the proposition that a court may protect a witness by forbidding a defendant from asking his address or like information, if there is a substantial showing of danger. *Smith v. Illinois,* 390 U.S. 129, 133–34, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) (White, J., concurring); *U. S. v. Harris,* 501 F.2d 1, 7 (CA9, 1974); *U. S. v. Alston,* 460 F.2d 48, 52 (CA5, 1972). Like the informer's privilege (*see* point (2) within n. 7, *supra*), these authorities are of doubtful application if the defendant already knows the witness and how to contact him. In any event, we are not aware that the rationale of these cases

has ever been extended to the point of allowing the exclusion of evidence at a criminal trial with a direct bearing on the guilt or innocence of the accused.

**9.** Although Agent Legaretta participated in and testified about some of the preliminary negotiations between Ivan and Roe, his story contradicted Ivan's in important particulars, and Roe was the only person whose testimony could resolve the inconsistency.

**10.** This discretion is implicit in the Supreme Court's admonition that the judge must rely on " 'his personal perception of the peculiarities of the case.' " *See* text accompanying n. 5, *supra*.

In simple terms, entrapment occurs "when the criminal conduct was 'the product of the creative activity' of law-enforcement officials," *Sherman v. U. S.*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) (emphasis omitted), or of those working closely with law-enforcement officials, *Gomez-Rojas*, 507 F.2d at 1220. The entrapment defense does not require proof of threats or coercion. It presupposes deceit, not force. Nor does the defense require that the entrapping individual must have stayed at hand until the sale was completed. If a government agent truly "implants the criminal design in the mind of the defendant," *U. S. v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973), and then disappears, the requirements of entrapment can still be met. In any event, the defendants' theory did not assume that entrapment had to be attributed to Roe alone. Instead the defendants blamed Roe, Legaretta and Comey jointly.

In short, the evidence against Rigoberto and Ivan was not so overwhelming as to show, beyond reasonable doubt, that the infringement at trial of defendants' constitutional rights was harmless.[11] *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The convictions must be, and are, REVERSED.[12]

---

11. The government did not come forward with independent evidence that the defendants were predisposed to commit narcotics offenses. It simply relied on the facts of the transaction and the Melchors' testimony to argue that entrapment had not occurred.

12. Because of this disposition of the case, we need not dwell on defendants' other assignments of error. In his instructions to the jury the District Court drew a distinction between "lawful entrapment" and "unlawful entrapment." We have often criticized that usage as confusing. *See, e. g., U. S. v. Oquendo*, 490 F.2d 161, 165 n. 9 (CA5, 1974).