**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Stan CARLIN, Defendant-Appellant.**

**No. 82–8105.**

United States Court of Appeals, Eleventh Circuit.

Feb. 22, 1983.

Rehearing and Rehearing En Banc Denied April 18, 1983.

Certiorari Denied May 31, 1983. See 103 S.Ct. 2431.

Steven W. Ludwick, Atlanta, Ga., for defendant-appellant.

Gerrilyn G. Brill, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HILL and ANDERSON, Circuit Judges, and LYNNE,* District Judge.

LYNNE, District Judge:

Indicted on five counts of interstate transportation of stolen and forged securities,[1] Stan Carlin was found guilty on all counts by the verdict of a jury. He appeals

from the judgment and sentence entered on October 30, 1979, and from the order denying his motion for a new trial, as supplemented with the permission of the Court, entered February 10, 1982. We affirm.

On November 6, 1978, Carlin opened up a checking account in his name at the Fulton National Bank in Atlanta, Georgia.[2] Between January 25, 1979, and March 26, 1979, he deposited in this account five checks in the respective amounts of $83,927.16, $127,930.77, $219,641.22, $229,584.06, and $338,916.79, totaling exactly one million dollars. These checks, which had been stolen from Brown & Root, Inc., of Houston, Texas, were drawn on that construction company's account at the Wachovia Bank in Greenville, North Carolina, payable to Carlin & Company. One of the two signatures on each check was a forgery. Each check was hand delivered to Carlin in Atlanta by Donald Joseph (Joe) Vincz, a long time acquaintance who resided in Indianapolis, Indiana.

Carlin's explanation of these check transactions was obviously not credited by the jury. In brief summary, his contentions proceeded along these lines: the Australian Government had issued to Minex, Inc., an "authority to prospect" (numbered 208P)[3] for gas and oil on approximately sixteen million acres in Queensland, Australia. In early 1975, he purchased a one-half percent overriding royalty interest in the project from Minex, and in October, 1976, acquired an additional one and one-half percent overriding royalty. He invested substantial funds in such project and expended time and money in unsuccessful efforts to interest investors.

In the fall of 1978, Vincz entered the picture. Carlin claimed to have sent a proposal to Vincz in which he offered to sell his Australian holdings for sixteen million dol-

---

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. 18 U.S.C. § 2314.

2. Although Carlin insisted that it was opened as a business account for his timber business, there was no activity in such account until January 25, 1979.

3. 208P stated on its face that it was issued for a period of four years commencing June 1, 1973.

lars. In turn, Vincz advised Carlin that he had learned from his contacts in that firm that Brown & Root was interested in purchasing his interest. As he delivered each of the five checks, Vincz reiterated Brown & Root's continuing interest and represented that such checks were to be credited upon the purchase price when agreed upon.[4] Out of the proceeds of the five checks, Vincz received in excess of $275,000, purportedly as a finder's fee.

We now turn serially to the issues raised on this appeal.

## I. CHALLENGES FOR CAUSE.

Appellant's contention that the trial court erred in denying the challenges of jurors Bullock and Dickey "for cause" is predicated entirely upon their responses to questions asked during voir dire of the jury panel.[5] The statutory disqualifications of jurors in the federal system appear in 28 U.S.C. § 1865(b). The suggestion that these two jurors should have been disqualified pursuant to 28 U.S.C. § 1865(b)(4) is unsupported by the record and is patently frivolous.

Determinations as to the impartiality of a juror are committed to the discretion of the trial judge and will not be grounds of reversal absent an abuse of discretion. *United States v. Salinas,* 654 F.2d 319 (5th Cir.1981). From the equivocal answers of the challenged jurors to loaded questions and from their failure to make any response to a question propounded to the entire panel[6] the trial court could have reasonably inferred that they were not biased but merely wished to be spared the inconvenience or economic loss resulting from jury service in a protracted trial. We conclude there was no abuse of discretion.[7]

---

**4.** Carlin had seen no contracts, correspondence, documentation, or communication from Brown & Root and had no contract or correspondence with Vincz.

**5.** MR. LUDWICK: Is there anybody that would be so inconvenienced that as a practical matter they ... could not in fairness ... serve in this trial:

> ....
> A JUROR: Mr. Bullock. My boss won't like it. My brother won't like it. I do extensive travel.
> MR. LUDWICK: Do you expect to do traveling?
> MR. BULLOCK: We schedule things as far as six months ahead. I am supposed to be at a conference right now. We have meetings starting Thursday.
> MR. LUDWICK: You feel you can serve through Friday?
> MR. BULLOCK: I can make it through Friday.
> ....
> MR. LUDWICK: Is there anybody who feels that no way ... they could sit through a trial and listen to the evidence and sit through deliberations ... that these other obligations are so overpowering they could not make the necessary sacrifices to stay?
> ....
> MR. LUDWICK: ... is there anybody who feels that they could not fairly sit and listen to all the evidence and deliberate for whatever time it took?
> ....

> MR. DICKEY: Like I say, I honestly don't think I could keep my mind entirely on the case.
> MR. LUDWICK: You feel, Mr. Dickey, if it went past Friday emotionally your mind would be elsewhere to the point where you could not listen to whatever evidence came after that point to deliberate. . . .
> MR. DICKEY: I am afraid so.
> . . . .
> MR. LUDWICK: I know you have a work obligation. Is it such your mind would be distracted that you would not give the attention—
> MR. BULLOCK: As long as the company doesn't care, if the problem comes up, I have a problem. If it doesn't come up, I don't know.
> MR. LUDWICK: ... if a problem comes up with the company and you were in the jury room deliberating you might rush your verdict more than normal in order to get out earlier. . . .
> MR. BULLOCK: Yes. I would want you guys to hurry up.

**6.** MR. LUDWICK: Is there anybody who is not willing to accept the Court's instructions that you have to wait until all the evidence is in and deliberate with the other jurors before you reach a conclusion?

**7.** We are in accord with the statement:

> There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury. *United States v. Ploof,* 464 F.2d 116, 118 n. 4 (2d Cir.1972) *cert. denied,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972).

## II. CLAIMS OF FIFTH AMENDMENT PRIVILEGE

During the trial, Appellant called Gumell, Griffin and Vincz as witnesses. Upon questioning by the court outside the presence of the jury, each stated that, upon advice of retained counsel, he would claim his Fifth Amendment privilege. Thereupon, without having conducted an in camera inquiry about the validity or scope of such claims, the court called each of them to the stand and asked each of them if he would answer any questions. When each responded in the negative, he was dismissed. Appellant's claim of error is predicated upon the trial court's failure to follow the teaching of *United States v. Goodwin,* 625 F.2d 693, 700 (5th Cir.1980). On its facts, the case sub judice is clearly distinguishable.

In *Hoffman v. United States,* 341 U.S. 479, 486–487, 71 S.Ct. 814, 818–819, 95 L.Ed. 1118 (1951), the Supreme Court explained that:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." [Citations omitted].

It is obvious from the facts on the record[8] that each of these witnesses had legitimate grounds for asserting his privilege against self-incrimination. Since the facts actually in evidence established that Gummell, Vincz, and Griffin had some connection with the stolen checks, the trial judge properly assumed that they were at least vulnerable to criminal charges related thereto. He did not abuse his wide discretion in sustaining the privileges. *United States v. Melchor Moreno,* 536 F.2d 1042, 1050 (5th Cir.1976).

## III. REFUSAL TO GRANT JUDICIAL IMMUNITY

Appellant contends that, after the Fifth Amendment claims of Grummell, Vincz, and Griffin had been sustained, the trial court erred in denying his oral and written motions that they be granted judicial use immunity in order that he might elicit from them exculpatory testimony[9] unavailable from any other sources. *United States v. Thevis,* 665 F.2d 616 (5th Cir.1982), is controlling here. In addressing the due process claim urged upon us, the Court observed:

> We conclude, however, after reviewing the various circuit opinions and conflicting policy arguments, that district courts may not grant immunity to defense witnesses simply because that witness has essential exculpatory information unavailable from other sources. *Id.* at 639.

---

8. In sustaining the claim of privilege, the court had before it the following severely capsulated facts:

1. Each of the five checks involved appeared to bear the signatures of D.L. Dickey and Jay A. Griffin. There was testimony that Dickey's signature was a forgery and that Griffin had signed at least three of the checks.

2. The five stolen checks were drawn on an account for which the Corpus Christi office of Brown & Root had responsibility. Griffin worked in that office.

3. Carlin received the stolen checks from Vincz.

4. Vincz and Gummell had made frequent calls to each other.

5. Gummell occupied a supervisory capacity in the security department of Brown & Root and was a close friend of Griffin who, in his administrative capacity, had access to checks in blank form.

6. Gummell's fingerprints were on the check stubs although he had no occasion to have access to such checks.

7. Vincz admitted to O. Richard Hamilton, a private investigator, according to Hamilton's testimony before the grand jury, that he had obtained the Brown & Root checks from Gummell and had paid him a portion of the money which he received from Carlin.

9. Counsel for Carlin proffered that, if immunized, Griffin would testify that he did not know and had never even heard of Carlin; that Gummell would testify that he had neither heard of nor spoken with Carlin, and that Vincz would testify that Carlin was unaware of any wrongdoing and was led to believe he was involved in a legitimate transaction with Brown & Root.

Since the record reveals no governmental abuse of the immunity process we pretermit any discussion of what effect, if any, prosecutorial misconduct would have in providing an exception to the foregoing rule.

## IV. REFUSAL TO ALLOW HEARSAY TESTIMONY

Relying upon the hearsay exception provided by Federal Rules of Evidence, Rule 804(b)(3),[10] 28 U.S.C., Appellant moved the admission of a statement made by Vincz,[11] concededly unavailable as a witness. In denying such motion, the trial court found that the proffered statement was not against the penal interest of Vincz within the contemplation of Rule 804(b)(3). Assuming, arguendo, that this finding was clearly erroneous in that his admission of knowledge of and participation in the receipt and delivery of the Brown & Root checks would have probative value in a trial against him, we turn to the requirement that corroborating circumstances *clearly* indicate the trustworthiness of the statement.

Since the trial court made no explicit finding as to the existence *vel non* of such circumstances, we have carefully reviewed the record, *United States v. Thomas,* 571 F.2d 285, 290 (5th Cir.1978), which reveals no corroborating circumstances *remotely* indicating the trustworthiness of the statement. There was no error in its exclusion.

The remaining issues require little discussion. After Carlin testified on direct examination that in 1978 he applied for two used car dealer licenses and introduced such licenses into evidence, the prosecution, over his timely objection, was permitted to cross-examine him as to the truthfulness of his answer on his verified application therefor that he had not been convicted of a felony. In this ruling we find no abuse of discretion. Rule 608(b)(1), Federal Rules of Evidence (28 U.S.C.).

Appellant's objection to the court's charge on "knowledge" was not well taken.[12] Such charge was identical to the charge approved in *United States v. Callahan,* 588 F.2d 1078, 1082 (5th Cir.1979).

AFFIRMED.

---

10. As here pertinent such exception reads:
    (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

    \*　　\*　　\*　　\*　　\*　　\*

    (3) Statement against interest. A statement which was at the time of its making ... so far tended to subject him to ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissable [sic] unless corroborating circumstances clearly indicate the trustworthiness of the statement.

11. It was submitted that Hamilton, Carlin's private investigator, would testify in substance that, prior to the trial, he interviewed Vincz who was incarcerated pursuant to a material witness warrant obtained by defendant; that Vincz admitted that he delivered to Carlin the Brown & Root checks, which he had received in Texas; that Carlin had offered him a 25 percent finder's fee for producing someone to reopen an oil and gas well in Australia; that all Carlin knew was that the checks were in response to an agreement by Brown & Root to work such well, and that Carlin asked him on several occasions after that whether he was going to receive a contract from Brown & Root.

12. The court charged: "Now the element of knowledge may be satisfied by inferences from proof that a defendant deliberately closed his eyes to what otherwise would have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the facts. It is entirely up to you as to whether you find any deliberate closing of the eyes and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge."