**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Eduardo Jaime ROUCO,
Defendant-Appellant.**

No. 83–5820.

United States Court of Appeals,
Eleventh Circuit.

July 15, 1985.

Rehearing and Rehearing En Banc Denied
Aug. 22, 1985.

Robert L. Moore, Ct. Appt., Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Linnea Johnson, Linda Hertz, Michael P. Sullivan, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and FAY, Circuit Judges, and ALLGOOD *, District Judge.

TJOFLAT, Circuit Judge:

The appellant, Eduardo Jaime Rouco, was convicted of murdering Eddie Benitez, a special agent of the United States Bureau of Alcohol, Tobacco and Firearms, Department of the Treasury (ATF), while Agent Benitez was operating in an undercover capacity investigating firearms and narcotics trafficking in South Florida. Rouco was also convicted on ten counts charging various firearm and drug offenses.[1] He appeals, presenting several claims of reversible error. We find no error and affirm.

I.

Eduardo Jaime Rouco shot and mortally wounded Special Agent Benitez in the parking lot of a Miami shopping center on July 8, 1983, as Benitez and several other ATF agents were attempting to arrest him. The episode ended an undercover investigation which implicated Rouco in the trafficking of guns, silencers, car bombs, and cocaine.

The investigation originated on May 21, 1983, when Rouco and an accomplice offered to sell a rifle, a silencer, and a car bomb to an ATF informant in Miami. The informant reported the offer to the ATF, and Agent Benitez had the informant introduce him to Rouco. The introduction took place on May 24. Agent Benitez, posing undercover as a potential buyer of illegal guns and explosives, and the informant met Rouco and one of his accomplices in the parking lot of the Central Shopping Plaza in Miami, and Benitez paid them $2,300 for a dismantled rifle, a silencer, and a car bomb. Benitez was armed with a listening device, and ATF agents tape recorded the meeting. Agent Benitez met Rouco again on June 10 and purchased a .22 caliber pistol with an attached silencer for $900. At that time, Rouco offered to supply guns and silencers in the future, in lots of fifteen per transaction. Rouco also explored the possibility of selling cocaine to the agent. The ATF recorded this conversation.

On June 17, Rouco met Agent Benitez and the informant at a restaurant for lunch to discuss further the cocaine deal. Rouco brought a new confederate to the meeting, Leonisio Cruz, whom he called "Weecho." The ATF tape recorded the meeting. After

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama sitting by designation.

1. The indictment charged Rouco in 14 counts with the murder of an agent of the Bureau of Alcohol, Tobacco and Firearms while the agent was engaged in the performance of his official duties, in violation of 18 U.S.C. §§ 1111(a) and 1114 (1982) (count one); conspiracy to possess and transfer unregistered firearms, in violation of 18 U.S.C. § 371 and 26 U.S.C. §§ 5861(d) and (e) and 5871 (1982) (count two); conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982) (count three); possession and transfer, respectively, of an unregistered silencer and a destructive device, in violation of 26 U.S.C. §§ 5861(d) and (e) and 5871 (1982) (counts four and five); possession by a convicted felon of a Marlin semiautomatic rifle, which had been transported into Florida in interstate commerce, in violation of 18 U.S.C. app. I § 1202(a)(1) (1982) (count six); possession and transfer, respectively, of an unregistered silencer, in violation of 26 U.S.C. §§ 5861(d) and (e) and 5871 (1982) (counts seven and eight); possession by a convicted felon of a .22 caliber Ruger, which had been transported to Florida in interstate commerce, in violation of 18 U.S.C. app. I § 1202(a)(1) (1982) (count nine); possession and transfer, respectively, of four unregistered silencers, in violation of 26 U.S.C. §§ 5861(d) and (e) and 5871 (1982) (counts ten and eleven); distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (1982) and 18 U.S.C. § 2 (1982) (count twelve); carrying a firearm while engaged in a conspiracy to possess with intent to distribute cocaine, in violation of 18 U.S.C. § 924(c)(2) (1982) (count thirteen); and possession of a .38 caliber Charter Arms firearm which had been transported in interstate commerce, after having been convicted of manslaughter in Dade County, Florida, on April 7, 1981, in violation of 18 U.S.C. app. I § 1202(a)(1) (1982) (count fourteen). Counts six, nine, and fourteen were severed from the indictment prior to Rouco's trial and are not involved in this appeal.

some discussion of a price for four kilograms of cocaine, Weecho left the table with Agent Benitez and went to a nearby automobile body shop. There, Weecho's associate, Orlando Hernandez, gave Benitez a sample of cocaine. Benitez and Weecho then returned to the restaurant, where Rouco gave him a cocaine tester which he represented to be the kind the police used. Thereafter, the meeting broke up, and the men left the restaurant. In the parking lot, Rouco called Benitez over to Rouco's car and gave him a black satchel filled with silencers.

At this point, the ATF decided to call the Federal Drug Enforcement Administration (DEA) into the investigation because of the large amount of cocaine involved. The next meeting, which ATF agents again tape recorded, occurred on June 21 in the parking lot of the Bowl Bar, located near the Orange Bowl in Miami. Accompanying Agent Benitez and the informant was DEA Special Agent Jerry Castillo, acting undercover as a narcotics trafficker. Other agents provided protective surveillance for the meeting. At the meeting Benitez and Castillo negotiated with Rouco and Weecho to buy four kilograms of cocaine. Rouco wanted the transfer to occur at his apartment, but the agents objected, preferring a more public place. Rouco then suggested that Benitez, Castillo, and the informant might be federal agents and stated that he did not want to complete the deal. The agents agreed to call it off and started for their car. Weecho interrupted them, however, indicating that he was willing to take the chance and deal with them. He said he would complete the cocaine transaction if they went to the automobile body shop where it could not be observed.

Rouco took the agents to the garage, Buster's Mobil Service, and Weecho went off to obtain the four kilos of cocaine. At the garage, while they were waiting for Weecho to arrive, the agents noticed that Rouco was carrying a .38 caliber pistol concealed in the small of his back. Weecho subsequently telephoned the garage and told Rouco that he would not deliver the

cocaine because he had spotted several suspicious vehicles in the area.

Agents Benitez and Castillo made two more attempts to secure the cocaine, but they were unsuccessful. Weecho was convinced that they were federal agents and refused to deal with them. Rouco offered to provide them with another cocaine source, but the DEA believed that further attempts to make a buy would prove fruitless. The ATF agents therefore decided to terminate their investigation and arrest Rouco.

On July 8, 1983, ATF agents observed Rouco's sports car parked at his apartment, and they formulated the following plan for his arrest. Agent Benitez would go to the apartment and lure Rouco to the usual meeting spot in the Central Shopping Plaza parking lot, using the pretext that there Rouco would be paid the balance due for the silencers he had delivered earlier. Four ATF back-up agents would follow Benitez and Rouco in another car and assist in making the arrest.

Shortly after noon on July 8, Agent Benitez went to Rouco's apartment and put the plan in motion. The two men left the apartment in separate vehicles and arrived at the shopping center parking lot at about 1:00 p.m. Benitez parked his car two spaces away from Rouco's sports car. The ATF back-up unit, having been delayed in traffic, was not there, and Benitez needed to stall for a few minutes. He left his car and walked over to Rouco's sports car. Rouco was behind the steering wheel; a revolver was lying next to him on the seat. Benitez leaned on the opposite, passenger side of the car with his hands on the door and engaged Rouco in small talk through the open window. He explained that the person who was delivering the money would arrive at any moment. Rouco became very suspicious and decided to leave. He put the car into reverse and told Benitez that he was going to buy some gasoline. At that moment, the ATF back-up car pulled into the parking lot behind Rouco's vehicle. Benitez, realizing that he must act quickly, nodded to the other

agents, dropped back several feet from the passenger side of Rouco's car, drew his gun and crouched into a combat stance, and yelled "policia, policia, policia." Rouco, apparently not realizing that other agents were on the scene, grabbed his gun from the car seat and dove for the protection of the passenger door. A gun battle ensued, and Rouco shot Benitez in the forehead. When the agents in the back-up vehicle opened fire, Rouco realized that resistance would be impossible and immediately surrendered.

The agents placed Rouco under arrest and gave him his *Miranda* rights in Spanish, his native tongue, and transported him to the Miami Police Department headquarters. There, in the homicide division office, Rouco was given food, water, and the opportunity to use the bathroom. Homicide detectives again read him his *Miranda* rights in Spanish. Rouco waived his rights and agreed to talk with the detectives. Two Spanish-speaking plainclothes homicide detectives proceeded informally to question him about the shooting. Realizing that he was in custody, and that there was no doubt over his guilt or the seriousness of his offense, Rouco became worried and depressed. He knew that he was almost certain to receive a heavy prison sentence and, if Special Agent Benitez died, possibly the death penalty. At one point, he asked the detectives to give him a gun and he would "end up everything."

Later, the detectives arranged to take a formal stenographic statement from Rouco. First, they gave him a printed form, written in Spanish, containing an explanation of his *Miranda* rights. A detective and Rouco, together, read the form aloud in Spanish. At the detective's request, Rouco initialed every *Miranda* right after they had read it and then signed the form at the end. The detectives thereafter took the stenographic statement. They used the following procedure because Rouco could not speak English. First, a detective would ask a question in English. Then, a Spanish-speaking detective would translate the question into Spanish and Rouco's response into English, for the stenographer to record. At the conclusion of the interrogation, Rouco was given a rest while his statement was typed. Afterwards, a Spanish-speaking detective carefully reviewed the statement with Rouco in Spanish to make sure that it was accurate. Finally, Rouco signed the statement.

Agent Benitez died several days later. Rouco was charged in a fourteen-count indictment with first degree murder and the firearms and narcotics violations we note in the margin.[2] Upon Rouco's request, he was represented by two court-appointed, Spanish-speaking attorneys. Prior to trial, Rouco moved to suppress his post-arrest statements on alternative grounds: that he was so depressed and disoriented, as a result of police brutality, as to render the statements involuntary, and that the police had violated the *Miranda* rule by not informing him of his right to counsel or by questioning him after he requested the presence of an attorney. The court denied Rouco's motion.

At trial, the prosecution presented overwhelming evidence of guilt, including numerous eyewitness accounts, tape recordings, and physical evidence, in the form of guns and drugs, obtained from Rouco or his accomplices. The defense presented a claim of self-defense, contending that Rouco believed Agent Benitez to be a Mafia chieftain who was trying to kill him. The jury found Rouco guilty of second degree murder, on the first degree murder count, and guilty as charged on the remaining counts. This appeal followed.

## II.

Rouco presents six claims of reversible error. According to Rouco, the trial court erred (1) in failing to excuse for cause an Hispanic juror who, Rouco contends, lacked sufficient proficiency in English to render fair and impartial jury service; (2) in refusing to grant a mistrial following a prejudicial remark by a prosecution witness; (3)

---

**2.** *See supra* note 1.

**988**

in failing to suppress Rouco's post-arrest statements to the police; (4) in allowing Agent Benitez' supervising agent, over the defense's hearsay objection, to identify the source of the cocaine sample Benitez obtained on June 17, 1984; (5) in refusing to allow a defense expert to explain the inadequacy of the arrest procedure Agent Benitez was employing when Rouco shot him; and (6) in refusing to grant Rouco a judgment of acquittal on the charge of possessing a firearm during the commission of a felony. We consider Rouco's claims sequentially.

## A.

■ During the selection of the jury, Rouco moved the court to excuse an Hispanic venire person, Magda Flores, for cause on the ground that she lacked sufficient proficiency in English to render the

fair and impartial jury service contemplated by the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1877 (1982),[3] and the sixth amendment to the Constitution. The court denied the motion, finding that Mrs. Flores was sufficiently conversant in English to follow the proceedings and carry out her duties. Rouco renewed his motion during the government's case in chief, after Mrs. Flores had demonstrated some difficulty with English in a colloquy with the court. The court denied the motion, adhering to its earlier finding and ruling. We find no ground for reversal in the court's action on either of these occasions.

The court conducted the venire voir dire in this case; the lawyers participated by suggesting additional questions and areas of inquiry. The court's examination of Magda Flores[4] disclosed that she was mar-

---

**3.** The Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1877 (1982), provides that a person shall not be deemed qualified for service on a grand or petit jury unless he or she is able "to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form ... [or] is [ ]able to speak the English language." 28 U.S.C. § 1865(b) (1982). *See United States v. Pepe,* 747 F.2d 632, 648 n. 17 (11th Cir.1984). Prior to the court's commencement of the venire voir dire, Rouco presented no evidence that Mrs. Flores' return of the juror qualification questionnaire, completed in English, contained insufficient information about her ability to understand the English language for her name to be drawn for the venire from which the jury in his case was selected. *See United States v. Santos,* 588 F.2d 1300, 1303 (9th Cir.), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *Bumpus v. Uniroyal Tire Co.,* 392 F.Supp. 1405, 1406 (E.D.Pa.1975). Rouco's challenge to Mrs. Flores' qualification to serve was based solely on what transpired in the courtroom during the court's voir dire of the venire; hence, our review of the court's decision that she was qualified to be sworn as a juror is limited to that.

**4.** The court's colloquy with Mrs. Flores was as follows:

THE COURT: All right. Please be seated. Thank you. Next?

MS. FLORES: Magda Flores.

THE COURT: All right, Ms. Flores, tell us.

MS. FLORES: I don't speak English.

THE COURT: Let me ask you a couple of questions, if you don't mind. In what city or

what part of the county, Dade County, do you live?

MS. FLORES: In 109 Avenue, N.W.

THE COURT: Northwest? And how long have you lived in Dade County?

MS. FLORES: Six years.

THE COURT: Six years? And where did you live before you came to Dade County?

MS. FLORES: In Miami.

THE COURT: Miami. And how long have you lived in Miami all together?

MS. FLORES: Thirteen years.

THE COURT: Okay. And where did you come from when you moved here to Miami?

MS. FLORES: My country.

THE COURT: Where was that?

MS. FLORES: Guatemala.

THE COURT: Guatemala? All right. Are you married?

MS. FLORES: Yes.

THE COURT: Any children?

MS. FLORES: (Nodded head.)

THE COURT: How old are they?

MS. FLORES: My daughter eighteen years old. My boy fourteen years old. My daughter nine years old.

THE COURT: All right. Can you read English?

MS. FLORES: No much.

THE COURT: Do you read a newspaper, the Miami Herald, say, or the Miami News?

MS. FLORES: Yes, a little.

THE COURT: You can read them a little?

MS. FLORES: Yes.

THE COURT: Thank you ma'am. Please be seated. Next lady.

ried, had three children, and had been living in the United States for thirteen years. Her husband was a paramedic employed by Ackerly Communications; she was a housewife. Though she said she did not speak much English, she was able to respond coherently to the court's questions. The prosecutor challenged Mrs. Flores for cause because he believed that "she will not be able to read our English transcripts" of the tape recordings the ATF had made of Agent Benitez' meetings with Rouco which the prosecutor would introduce into evidence. Defense counsel opposed the challenge, and the court denied it, observing that the tape recordings would be played and that they were the items that would be offered into evidence, not the transcripts (which, presumably, would be utilized by the jury merely to follow the conversations on the tapes). The prosecutor declined to exercise a peremptory challenge and excuse Mrs. Flores.

Later, as the jury selection was coming to a close, defense counsel challenged Mrs. Flores for cause. Counsel told the court that he had thought from the beginning of the court's voir dire examination of Mrs. Flores that she lacked sufficient English proficiency to comprehend the proceedings and should be excused for cause. He explained that he had opposed the prosecutor's challenge for cause because he wanted to make the prosecutor use one of his peremptory challenges. Since the prosecutor had declined to do so, counsel continued, he felt obliged to move for the juror's excusal. The court refused to excuse Mrs. Flores, stating that it was satisfied with her ability to understand English.

The court's decision in passing on defense counsel's challenge for cause was a discretionary one, *United States v. Carlin,* 698 F.2d 1133 (11th Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983), and, as such, is entitled to considerable deference. In fact,

"[t]here are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on

challenges for cause in the empaneling of a jury."

*Id.* at 1135 n. 7 (quoting *United States v. Ploof,* 464 F.2d 116, 118–19 n. 4 (2d Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972). We find no abuse in the court's decision here.

Defense counsel's second attack on Mrs. Flores' qualifications to serve as a juror came during the government's case in chief, when the informant who introduced Agent Benitez to Rouco and was present during most of the criminal activity that led to Rouco's arrest was on the witness stand. The informant had testified at length about Benitez' negotiations with Rouco for the purchase of firearms, silencers, a car bomb, and cocaine. He then focused on the events of June 21, 1983, when Weecho aborted the delivery of four kilograms of cocaine to Agents Benitez and Castillo at the automobile body shop because he thought it was under police surveillance. After the informant related what took place on that occasion, the prosecutor made the following proffer in the absence of the jury: the informant would testify that around June 24 he and Benitez went to Rouco's apartment to pursue the cocaine deal. They discussed the matter with Rouco, and Rouco proposed to go to Weecho's house, where the cocaine was stashed, knock Weecho unconscious, and steal the cocaine. Benitez rejected the idea.

At the conclusion of the proffer, the court ruled that the testimony could come in but only with respect to count three of the indictment, charging a conspiracy to possess cocaine with intent to distribute, and that the jury would be instructed accordingly. When the jury returned, the informant, who was testifying in Spanish, repeated his proffered testimony and added that Rouco said he would kill Weecho if necessary to get the cocaine. When the court's interpreter had translated this added remark as far as the word "kill," defense counsel objected vigorously, thus preventing any further translation, and moved for a mistrial. The court excused the jury

from the courtroom, and, one by one, called the jurors back to determine whether they had heard the remark and, if so, whether they had been irreparably prejudiced thereby. It was after the court examined Mrs. Flores and the other jurors and denied the motion for mistrial that defense counsel

5. The court's inquiry proceeded as follows:

THE COURT: Miss Magda Flores.

Please come forward and take a seat in the middle there where we can talk. The next chair over. Please be seated.

Mrs. Flores, relax. You have not done anything, you have not said anything that is in way wrong or improper, so don't be concerned.

I want to ask you a few questions, and you will please give me the answers candidly, please. Will you?

MS. FLORES: Yes.

THE COURT: All right. Now, state your name. What is your name?

MS. FLORES: Magda Flores.

THE COURT: Fine. You are Juror No. 9; is that right?

MS. FLORES: Huh-huh.

THE COURT: Okay. Mrs. Flores, do you speak and understand Spanish?

MS. FLORES: Yes.

THE COURT: And is that your native tongue? Is that your native language?

MS. FLORES: Huh-huh. English, little.

THE COURT: But Spanish is your native tongue?

MS. FLORES: Yes.

THE COURT: Now, you recall just before lunch, just before we recessed, Perera, the witness, was asked a question and he gave a Spanish answer. And the interpreter was about to interpret it into English, and maybe said a few words. And Mr. Moore stood up and objected. Do you remember that?

MS. FLORES: Huh-huh.

THE COURT: Did you hear the answer in Spanish that Perera gave to that question to the interpreter? Did you hear this answer?

MS. FLORES: Yes.

THE COURT: Tell me what you heard. Speak up a little louder, please.

Tell me what you heard, as best you can recall.

MS. FLORES: I was—say it in English?

THE COURT: Say it in English, yes.

MS. FLORES: Not in Spanish?

THE COURT: No. Say it in English.

MS. FLORES: Oh, he said that Rouco, your friend Weecho—

THE COURT: Go ahead.

MS. FLORES: I am sorry.

THE COURT: It's all right. Take your time. Relax. No hurry. Just think about it calmly and tell me as best you can what you remember, whatever it was. Whatever it was that you remember, just tell me.

MS. FLORES: Well, he said Weecho, and he no say only him that he kill Weecho.

THE COURT: You heard him say something like that?

MS. FLORES: Yes.

THE COURT: Tell me as closely as you can what you remember, will you? Repeat it a little louder. Raise your voice level a little louder, please.

MS. FLORES: I have a difficulty in saying in English.

THE COURT: You are doing fine. Believe me, you are helping us. Just please raise your voice. Speak a little louder. That is all.

Tell us again what you heard him say. What did Perera say to the interpreter?

MS. FLORES: He said—he said, Weecho said, your friend—

THE COURT: Take your time. There's nothing wrong by way of whatever you remember, nothing improper on your part. Just tell us what it is that you remember. That is all we want to know. You are not going to get in any trouble. No problems, nothing like that by what you tell us.

Just tell us what you remember.

MS. FLORES: He says Weecho—I understand everything, and in English have much problem.

THE COURT: Well, let me ask you to say it in Spanish and let this interpreter translate it into English. Speak up in Spanish, and then let's hear it.

Go ahead. Give us the answer in Spanish.

MR. MOORE: Judge, with the microphone, maybe?

THE COURT: Go ahead, if you have got one. Is it working? It's not plugged in?

MS. FLORES: (Through Interpreter) Are you referring to the last question?

THE COURT: Yes.

MS. FLORES: (Through Interpreter) He said that Rouco said to Weecho that if he didn't—like if—that if he didn't do what he was saying to him, that he was capable of killing him.

THE COURT: All right. Now, did you hear what the interpreter—you better get back to the mike now.

THE INTERPRETER: Sure.

THE COURT: Did you hear what the interpreter said in English at all that time when she was translating?

MS. FLORES: Yes.

THE COURT: What did she say in English? Not now. I mean when she was translating

Flores had no apparent problem understanding the court's questions; she did, however, have some difficulty in framing her answers in English to her satisfaction. The court, sensing this, told her to relax and give her answers in Spanish; the court's interpreter would translate them into English for the court. The inquiry proceeded under this format. Mrs. Flores stated that she had heard the informant's remark, about being willing to kill Weecho to get the cocaine, but could, and would, follow the court's instruction to disregard the remark in reaching a verdict. Rouco contends that the court should have replaced Mrs. Flores with an alternate, arguing that the court's use of an interpreter during her examination conclusively established her lack of adequate proficiency in English to provide the quality of jury service the law requires.

The trial court had the responsibility of removing Mrs. Flores if she could not impartially evaluate the evidence and follow the court's instructions. . *See Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). The court's discharge of this responsibility was committed to its sound discretion, however, subject only to the essential demands of fairness. *United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir.1983); *see United States v. Carlin*, 698 F.2d 1133, 1135 & n. 7 (11th Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983). We will not fault its ruling here, absent an abuse of that discretion.

We are convinced that the court had an adequate basis for concluding that Mrs. Flores could render the quality of jury service the law contemplates. The record indicated that she understood English; her only difficulty was in speaking it. The fact that the court utilized its interpreter to assist Mrs. Flores in responding to its questions concerning the informant's prejudicial remark about Rouco did not, in and of itself, amount to a judicial finding that she lacked sufficient proficiency in the English language to serve on the jury. *United States v. Hayes*, 479 F.Supp. 901, 913 (D.C. P.R.1979), *aff'd in part, rev'd in part on other grounds*, 653 F.2d 8 (1st Cir.1981). As the district court observed, Mrs. Flores' shortcoming, speaking English, was offset by her command of Spanish, as much of the

Perera's answer. What did you hear her say? Did you hear the interpreter say anything?

MS. FLORES: Yes.

THE COURT: What did you hear?

MS. FLORES: (Through Interpreter) What was the question?

THE COURT: Did you hear the interpreter in English say anything?

MS. FLORES: (Through Interpreter) That question?

THE COURT: Yes.

MS. FLORES: (Through Interpreter) Oh, you started to saying it.

THE COURT: All right. But what did you hear her say in English?

MS. FI ORES: (Through Interpreter) The first words, yes.

THE COURT: What were the first words?

MS. FLORES: (Through Interpreter) Kill. Huh-huh.

THE COURT: All right. Now, that question and that answer were not relevant or material to this case. In other words, they had no place in here. They should not have been asked or answered. You understand?

THE WITNESS: (Nodded head)

THE COURT: Notwithstanding what you have heard, if I tell you that you must disregard that and erase it from your memory completely, the question and the answer, can you do that?

Answer yes or no.

MS. FLORES: Yes.

THE COURT: Now, withstanding whatever you heard, can you lay aside what it is that you heard and try this case fairly, impartially to both the defendant and the Government?

MS. FLORES: Huh-huh.

THE COURT: Answer yes or no.

MS. FLORES: Yes.

THE COURT: Now, I am going to ask the interpreter in Spanish to relate this to the juror.

Are you able to lay aside, to put aside whatever you heard in that question and answer and try this case fairly and objectively and unbiased as to both the defendant and the Government?

MS. FLORES: (Through Interpreter) Yes.

THE COURT: You would not let that question and that answer in any way interfere with your decision as a juror; is that correct?

MS. FLORES: (Through Interpreter) No.

THE COURT: All right. Now, I am going to ask the Clerk of the Court to take this juror back into chambers and keep her in there temporarily.

evidence in the case was presented in Spanish. In sum, we find no abuse of discretion in the district court's decision to allow Mrs. Flores to remain on the jury.

### B.

■ Rouco contends that the district court erred in refusing to grant a mistrial following the informant's remark that Rouco was willing to kill Weecho if necessary to get four kilos of cocaine from Weecho's house. We reject his contention.

In our view, the court handled the situation in commendable fashion. It promptly excused the jury and then examined each juror, alone, to determine if the juror heard the remark and, if so, whether he or she could put the remark aside, follow the court's instructions, and try the defendant fairly and impartially on the evidence the court permitted to come before the jury and its charge on the law. All but three of the jurors indicated that they had neither heard nor understood the remark in question. The three jurors who heard the remark were Spanish speaking. They stated that they could disregard the informant's remark and would not mention it to the other jurors. The court, concluding that its examination of these jurors, and their responses, eliminated the possibility that Rouco had suffered any undue prejudice, denied his motion for mistrial.

■ "Determinations of the impact of allegedly prejudicial testimony upon a jury, as well as what curative measures, if any, can be taken to negate the harmful effects, are matters within the sound discretion of the trial judge." *United States v. Rodriguez-Arevalo*, 734 F.2d 612, 615 (11th Cir. 1984); *see also United States v. Johnson*, 713 F.2d 654, 659 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). Prejudicial testimony is less likely to mandate a mistrial "when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury." *Rodriguez-Arevalo*, 734 F.2d at 615; *United States v. Rojas*, 537 F.2d 216, 222 (5th Cir.1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). Here, the strength of the evidence, the small number of jurors who heard the remark, and the court's curative measures convince us that the court did not abuse its discretion in refusing to grant a mistrial.

### C.

■ Rouco contends that his inculpatory statements to the police following his arrest were inadmissible because they were involuntary and/or obtained without proper *Miranda* warnings; if neither, the statements were inadmissible because they were obtained after he requested, and was denied, the presence of an attorney during the interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). The district court conducted a pretrial evidentiary hearing to determine whether the government complied with the *Miranda* requirements and, if so, to determine the statements' voluntariness. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *United States v. Sims*, 719 F.2d 375, 378 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984); 18 U.S.C. § 3501 (1982). The court found that the police cautioned Rouco in accordance with *Miranda* at least twice in Spanish, once orally at the arrest scene and once in writing at Miami police headquarters. On the second occasion, Rouco read the *Miranda* caution aloud, along with a detective, and initialed the police *Miranda* form after each right and signed it at the end. The district court also found that Rouco never requested an attorney before agreeing to discuss the crimes with the police. The record strongly supports both of these findings; accordingly, we are bound thereby. *See United States v. Suggs*, 755 F.2d 1538, 1541–42 (11th Cir.1985).

■ Rouco has maintained that his statements were the product of the police department's physical and psychological treatment of him and thus were coerced. Such treatment purportedly began at the arrest scene, when he was placed face

down on the hot parking lot pavement and handcuffed. An ATF agent put his foot on Rouco's shoulders and pointed a gun at his head while the other agents attended to Agent Benitez. After the Miami police arrived, Rouco was placed in the back of an unairconditioned police squad car with the windows rolled up. He stayed there for twenty minutes, until he got to the station house. During this trip, Rouco said, he became afraid that the police would torture and kill him. By the time he got to the police station, he continued, he was confused, disoriented, and depressed; he even thought about committing suicide.

The court had substantial evidence before it contradicting Rouco's allegation of police mistreatment. This evidence indicated that any physical discomfort Rouco may have suffered at the arrest scene was not caused intentionally but stemmed from the agents' preoccupation with Benitez' condition. At the police station, the Miami homicide detectives treated Rouco with utmost consideration and respect. They made sure that he had plenty of food and drink and was able to use the restroom and wash up. They promised him that he would not be harmed and offered to place a uniformed guard outside the restroom door to protect him. Finally, the detectives gave him a break after the original statement to ensure that he was fresh when they reviewed it with him for errors.

The district court concluded that Rouco's depression was a natural consequence of being caught during the commission of a murder. Rouco knew that the evidence against him was strong and that he had little hope of avoiding a long prison sentence; even the death penalty loomed as a possibility. The court determined, however, that neither this depression nor Rouco's treatment at the arrest scene rendered his subsequent statements involuntary.

■■■ The standard for evaluating the voluntariness of a confession is whether the accused "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and cir-

cumstances swirling around him." *Jurek v. Estelle,* 623 F.2d 929, 937 (5th Cir.1980) (en banc), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 and 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981); *see also United States v. Castaneda-Castaneda,* 729 F.2d 1360, 1362 (11th Cir.1984). In analyzing the voluntariness of a confession, the totality of the circumstances surrounding the confession must be examined. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Roark,* 753 F.2d 991, 993 (11th Cir.1985). Statements or confessions made during a time of mental incompetency or insanity are involuntary and consequently inadmissible. *Townsend v. Sain,* 372 U.S. 293, 309, 83 S.Ct. 745, 755, 9 L.Ed.2d 770 (1963); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). But mere emotionalism, confusion, or depression do not dictate a finding of mental incompetency or insanity. *Corn v. Zant,* 708 F.2d 549, 567 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2670, 81 L.Ed.2d 374 (1984); *Sullivan v. Alabama,* 666 F.2d 478, 483–84 (11th Cir.1982). Some amount of nervousness and depression following one's arrest for murder, where the evidence of guilt is overwhelming, is normal and not grounds for holding an otherwise valid confession inadmissible. *United States v. Arroyave,* 477 F.2d 157, 161 (5th Cir.1973). The district court's determination that Rouco voluntarily and knowingly gave the statement to the police was not clearly erroneous; hence, we deny his claim of error. *United States v. Alegria,* 721 F.2d 758, 761 (11th Cir.1983); *United States v. Vera,* 701 F.2d 1349, 1364 (11th Cir.1983).

### D.

Rouco contends that the district court erred in permitting Agent Benitez' supervisor, James Pherson, to testify about Benitez' acquisition of the sample of cocaine Benitez received while he and the informant were negotiating a cocaine deal with Rouco and Weecho. Agent Pherson was in charge of the undercover operation and

participated in the electronic monitoring of Benitez' conversations with Rouco. Referring to the June 17, 1983 restaurant meeting where Benitez, Rouco, and Weecho negotiated for the sale of four kilograms of cocaine, Pherson testified that he was outside the restaurant in his car listening to their conversation through a device concealed on Benitez' person. After about fifty minutes, he observed Agent Benitez and Weecho leave the restaurant and walk down the street. A short time later they reappeared in the restaurant parking lot; Rouco opened the trunk of his car and signaled Benitez to come over. Approximately thirty minutes after this episode ended, Pherson debriefed Benitez at ATF's headquarters. Benitez turned over a black satchel with four silencers, a cocaine testing kit, a small quantity of cocaine, and a business card from Buster's Mobil station. Over defense counsel's hearsay objection, the court permitted Agent Pherson to testify that Benitez told him that he had received the cocaine from Orlando Hernandez at an automobile body shop he and Weecho visited after they left the restaurant. The court allowed this statement to be received under the residual hearsay exceptions, Fed. R.Evid. 803(24) and 804(b)(5).

■ In passing on the propriety of this evidentiary ruling, we note that not every contingency is covered by the specific hearsay exceptions provided in the Federal Rules of Evidence. There are occasions where out-of-court utterances are highly trustworthy and valuable to the fact finder, but do not fit neatly within an established exception of the hearsay rules. *Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388, 392, 397-98 (5th Cir. 1961). The district court concluded, and we agree, that Agent Benitez' statement, as related by Agent Pherson, had circumstantial guarantees of trustworthiness equivalent to those inherent in statements admissible under the specific hearsay exceptions of Rules 803 and 804(b) and that the prerequisites to admissibility were present. *See, e.g., United States v. Mathis*, 559 F.2d 294, 298 (5th Cir.1977).

The circumstantial guarantees as to the trustworthiness of Benitez' statement about the cocaine's origin were substantial. First, the informant had previously testified that, before Weecho and Benitez left the restaurant, Weecho said they were going to a nearby place to view the cocaine. When they returned, Weecho told the informant that they had gone to an automobile body shop to get a sample of the cocaine. Defense counsel cross-examined the informant extensively on this point. Agent Pherson's personal observation that Weecho and Benitez left the restaurant and returned a short time later corroborated the informant's testimony; Pherson, too, was subject to cross-examination. The Buster's Mobil station business card Benitez gave Pherson substantiated Benitez' and the informant's statement that they went to a nearby auto garage. Finally, Benitez' report to his superior about the event was made a mere thirty minutes after the fact. In such a short period of time Benitez could not have been confused over where and from whom he had received the cocaine. Furthermore, he had every incentive to report truthfully. His life, and the lives of his fellow agents, and the success of the investigation depended on the accuracy of the information he provided. In the face of all this corroboration, the trustworthiness of the challenged out-of-court statement cannot seriously be disputed.

The other requirements of the residual hearsay exceptions are easily satisfied. Rouco concedes that the origin of the cocaine sample was a material fact and that Pherson's testimony on the point was the most probative evidence available. In addition, the admission of the testimony served well the intent of the rules of evidence and the administration of justice; the jury heard reliable, pertinent, and necessary information bearing on Rouco's guilt or innocence. Finally, the defense had ample notice, three days before jury selection began, of the prosecutor's intention to introduce these statements. *See United States v. Carlson*, 547 F.2d 1346, 1355 (8th Cir. 1976) (two days' notice permissible), *cert.*

*denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

 Rouco contends, alternatively, that the introduction of Agent Benitez' hearsay statement violated his sixth amendment right of confrontation. Again we disagree. A defendant may waive his right to confront a witness. *Cf. Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975); *Snyder v. Massachusetts,* 291 U.S. 97, 106–08, 54 S.Ct. 330, 332–33, 78 L.Ed. 674 (1934); *see generally Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In this case, Rouco waived his right to cross-examine Benitez by killing him. "The Sixth Amendment does not stand as a shield to protect the accused from his own misconduct or chicanery." *United States v. Carlson,* 547 F.2d at 1359. We have previously stated that:

> The law simply cannot countenance a defendant deriving benefits from murdering the chief witness against him. To permit such subversion of a criminal prosecution "would be contrary to public policy, common sense, and the underlying purpose of the confrontation clause," ... and make a mockery of the system of justice that the right was designed to protect.

*United States v. Thevis,* 665 F.2d 616, 630 (5th Cir. Unit B) (quoting *United States v. Carlson,* 547 F.2d at 1359), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 and 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370 and 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

### E.

 Rouco contends that the trial court erred by excluding expert testimony he was prepared to present concerning the adequacy of the arrest procedure the ATF employed in this case. The testimony would have shown, allegedly, that the technique Agent Benitez used in attempting to arrest Rouco fell below all known standards of proper police conduct and increased the risk that Rouco would believe that Benitez was not what he purported to be and would harm him. Such expert testimony, Rouco maintains, would have supported his argument that he acted in self-defense, on the mistaken belief that Benitez was a Mafia hit-man.

At a pretrial hearing, the court ruled *in limine* to exclude the expert's opinion testimony. The court posited three reasons for its decision. First, the subject matter of the testimony, the professional standard for an undercover arrest, was irrelevant to Rouco's subjective intent when Benitez sought to apprehend him absent evidence that Rouco knew of such professional standard at the time. Expert testimony not relevant to any issue in the case and which would not assist the jury had to be excluded. *United States v. Sorrentino,* 726 F.2d 876, 885 (1st Cir.1984); *United States v. Bowers,* 660 F.2d 527, 529 (5th Cir.1981); Fed.R.Evid. 702. Second, the expert's opinion that Rouco might have been confused or mistaken as to Agent Benitez' identity or that the average citizen might have expected Benitez to have acted differently in attempting Rouco's arrest would be valueless, since the expert could offer nothing beyond the understanding and experience of the average citizen. *United States v. Webb,* 625 F.2d 709, 711 (5th Cir.1980); *United States v. Brown,* 540 F.2d 1048, 1054 (10th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977); Fed.R.Evid. 702 advisory committee note. Finally, such expert opinion testimony would mislead the jury; it would create the impression that the defendant's criminal responsibility for Agent Benitez' murder was to be contingent upon Benitez' conformity to standard arrest procedure, i.e., Benitez' lack of negligence.

 The trial judge may exclude expert opinion evidence, even if relevant, if its probative value is substantially outweighed by the danger of confusion of the issues or misleading the jury. Fed.R.Evid. 403. The judge's exercise of this discretion should be upheld unless manifestly erroneous. *United States v. Sans,* 731 F.2d 1521, 1530 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985); *United States v. Johnson,* 713 F.2d 654, 659

(11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). We find no such error here, for each of the three reasons the judge gave for excluding the proffered expert testimony provided an adequate legal basis for his ruling.

### F.

 Rouco was convicted of unlawfully carrying a firearm during the commission of a felony, in violation of 18 U.S.C. § 924(c)(2) (1982).[6] Under section 924, an offense can only be made out if the carrying of the firearm is in violation of federal, state, or local law. *United States v. Bower,* 575 F.2d 499 (5th Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978). The indictment alleged that Rouco had violated Fla.Stat. § 790.07(2) (1983) by "display[ing], use[ing], threaten[ing], or attempt[ing] to use" a firearm during the commission of a felony.[7] Rouco maintains that the district court erred in denying his motion for judgment of acquittal as to this count because he was not in possession of a "firearm" as defined by Fla.Stat. § 790.-001(6) (1983).

At trial, DEA Special Agent Castillo testified that he observed Rouco remove a cheaply made .38 caliber pistol from the small of his back while they were at the automobile body shop waiting for Weecho to deliver the cocaine. On cross-examination, the defense brought out that Agent Castillo never inspected the inner mechanism of Rouco's gun to determine if it was capable of firing a bullet. Fla.Stat. § 790.-001(6) (1983) defines a firearm as follows:

> "Firearm" means any weapon (including a starter gun) which will, is designed to, or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; any destructive device; or any

machine gun. The term "firearm" does not include an antique firearm....

 Rouco argues that the government failed to prove that the pistol was in fact a firearm capable of expelling a projectile. We find this argument imaginative, but frivolous. Under Florida law, "operability is not a determinative factor in defining a firearm." *Machado v. State,* 363 So.2d 1132, 1136–37 (Fla.Dist.Ct.App.1978), *cert. denied,* 373 So.2d 459 (Fla.1979). *See also Martin v. State,* 367 So.2d 1119, 1120 (Fla.Dist.Ct.App.1979). Testimony by an experienced federal law enforcement officer familiar with handguns that the defendant carried a .38 caliber pistol certainly authorized the jury to find that the defendant possessed a firearm, defined as a weapon "designed to ... expel a projectile." Fla.Stat. § 790.001(6) (1983).

### III.

For the reasons we have stated, the convictions of Eduardo Jaime Rouco are

AFFIRMED.

---

6. This offense was charged in count thirteen of the indictment. *See supra* note 1. Section 924(c)(2) (1982) provides that:
 (c) Whoever—
 ....
 (2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States,

shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years.

7. Rouco was charged in count three with conspiring to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846 (1982).